## ROEHM v. HORST.

CERTIORARI TO THE COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 188. Argued March 15, 16, 1900. — Decided May 14, 1900.

After a careful review of all the cases, American and English, relating to anticipatory breaches of an executory contract, by a refusal on the part of one party to it to perform it, the court holds that the rule laid down in *Hochster* v. *De la Tour*, 2 El. & Bl. 678, is a reasonable and proper rule to be applied in this case.

That rule is that after the renunciation of a continuing agreement by one party, the other party is at liberty to consider himself absolved from any future performance of it, retaining his right to sue for any damages he has suffered from the breach of it; but that an option should be allowed to the injured party, either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding for the exercise of this option.

The parties to a contract which is wholly executory have a right to the maintenance of the contractual relations up to the time for performance, as well as to a performance of the contract when due.

As to the question of damages, when the action is not premature, the plaintiff is entitled to compensation based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by reason of circumstances of which he ought reasonably to have availed himself.

THIS was an action for breach of four certain contracts, brought

by Paul R. G. Horst and others against John Roehm in the Circuit Court of the United States for the Eastern District of Pennsylvania, in January, 1897, and was tried under a stipulation, waiving a jury, before Dallas, Circuit Judge, who made a special finding of facts, and, on the facts so found, gave judgment for plaintiffs. 84 Fed. Rep. 565. The case was carried by defendant to the Circuit Court of Appeals for the Third Circuit, and the judgment of the Circuit Court was affirmed. 62 U. S. App. 520. Thereupon Roehm applied to this court for a writ of certiorari, which was granted, and the cause subsequently heard here.

The Circuit Court found that —

"On August 25th, 1893, the firm of Horst Brothers, composed of Paul R. G. Horst, E. Clemens Horst and Louis A. Horst, the legal plaintiffs, entered into four written contracts with John Roehm, the defendant, of which the following are copies:

### "'Hop Contract.

"'Memorandum of agreement made and entered into by and between Horst Brothers, doing business in the city of New York, parties of the first part, and John Roehm, party of the second part.

"'Witnesseth: That the said parties of the first part agree to sell and deliver to the party of the second part, and that the party of the second part agrees to purchase, pay for, and receive from the party of the first part one hundred (100) bales, prime Pacific Coast hops of the crop of 1896. Three and one half pounds tare to be deducted on each bale. Said hops to be delivered ex dock or store, New York city, and to be paid for in net cash ten days from date of arrival at the rate of twenty-two (22) cents per pound.

"'Time of shipment, 20 bales each month, October, November, December, January and February, except as hereafter provided.

"'If at any time a difference of opinion shall exist regarding the quality or condition of any hops submitted or tendered under this agreement, each party shall select an arbitrator, to whom the question of the quality and condition shall be submitted,

and in case of their disagreement, a third arbitrator shall be selected by the two thus chosen, and the decision of the majority of the three shall be final; and in case the decision shall be that the hops tendered are not equal to the quality above called for, the parties of the first part shall, within thirty days after receipt of written notice of such decision, submit samples or tender delivery to the party of the second part, other hops, in fulfillment of this agreement, and party of the second part agrees to receive same.

" ' In witness whereof, the said parties have hereunto set their hands, Phila., this 25th day of August, 1893.

" ' HORST BROS.<br>" ' JOHN ROEHM.' "

[Here followed a second, third and fourth contract, of same tenor and under same date, the second for one hundred bales of the crop of 1896, to be shipped twenty bales each month, in the months of March, April, May, June and July; the third for one hundred bales of the crop of 1897, to be shipped, twenty bales each month, in the months of October, November, December, January and February; and the fourth for one hundred bales of the crop of 1897, to be shipped twenty bales each month, in the months of March, April, May, June, and July.]

" The months named in each of these contracts respectively, as ' time of shipment,' must, under the custom of the trade, be understood as meaning the month so named, which would follow next after the summer months of the year of the crop referred to in the particular contract.

" On June 23d, 1896, the firm of Horst Brothers was dissolved, and Paul R. G. Horst assigned to his copartners, E. Clemens Horst and Louis A. Horst, the use plaintiffs, all the interest of him, the said Paul R. G. Horst in the said contracts.

" Upon June 23d, 1896, a notice, of which the following is a copy, was addressed to and received by the defendant:

" ' June 23, 1896.

" ' Dear Sir: We beg to inform you that the partnership of Horst Brothers has been this day dissolved.

" ' Respectfully yours,<br>" ' HORST BROTHERS.'

" To this, under date of June 27th, 1896, the defendant replied, saying : . . . ' I suppose that your reason for giving me the notice is on account of the contracts which I had with your late firm, . . . which, of course, you cannot fulfill. I therefore consider the contracts annulled and will make other arrangements for the purchase of the hops I may need, and you may consider this as release from liability on your part to comply with the contracts.' In answer to this, Horst Brothers in liquidation addressed a letter to the defendant, which he duly received, in which it was said that he had misconstrued the notice of dissolution sent out to the trade ;. that its meaning was that no new contracts would be made and no new business undertaken by the firm of Horst Brothers ; and in which it was further stated that, ' so far as the firm or business is concerned, the firm will discharge its obligations and will try to collect its claims ; it does not ask for any release or discharge, and will punctually live up to all the contracts which it has made with you.' This communication was not replied to.

" In October, 1896, the first shipment of twenty bales of hops under the contracts was made, and the invoice and bill of lading covering that shipment were sent to the defendant, who, on October 24, 1896, by telegram and letter, acknowledged receipt of the bill of lading and bill of particulars, but, upon the ground set up in his letter of June 27, 1896, declined to receive the hops.

" At the time of the defendant's refusal to receive the shipment above mentioned, the plaintiffs could have made subcontracts for forward delivery according to the contracts in suit, at the price of nine cents per pound for ' prime Pacific Coast hops of the crop of 1896,' and of eleven cents per pound for like hops of the crop of 1897 ; and the difference between the prices fixed by the contracts sued on and these above stated, together with interest on the sum of such differences, from October 24, 1896, to this date, are as follows."

[Here followed the computation resulting in the amount for which judgment was rendered.]

The opinion of the Circuit Court of Appeals stated the case thus :

" In August, 1893, Paul R. G. Horst, E. Clemens Horst and Louis A. Horst, trading as Horst Brothers, entered into a contract with John Roehm, the defendant below, for the sale of one thousand bales of prime Pacific Coast hops, to be delivered at various dates in the future, at an uniform price of twenty-two cents per pound. Of the whole quantity six hundred bales had been delivered, accepted, and paid for at the contract price, so that in July, 1896, there remained undelivered four hundred bales. These were deliverable at the rate of twenty bales per month during each month from October, 1896, to July, 1898, both inclusive, excepting, however, from said period the months of August and September, 1897, when no deliveries were called for. The record shows that this contract was the result of one negotiation, and provided for a supply of hops for five years. Ten separate papers were drawn, each covering a period of five months or one season. They all bear the same date; are similar as regards the quantity of hops to be delivered, and the price to be paid. They differ only in the time of delivery and the year's crop from which delivery was to be made. In June, 1896, the firm of Horst Brothers was dissolved by the retirement of Paul R. G. Horst. He assigned his interest in the Roehm contract to the remaining partners, who continued the business under the same firm name. Roehm, the defendant below, was notified of this dissolution of the firm and of the transfer of Paul R. G. Horst's interest in the contract to its successors. He thereupon gave notice to the firm that he considered his contract cancelled thereby. Subsequently the firm of Horst Brothers advised the defendant of their ability and willingness to perform the contract, and under date of September 4, 1896, wrote Roehm, as follows:

" ' Dear Sir : Will you please write us whether you wish us to ship the hops under your contract direct to your city. The contract calls for delivery in New York, and as we ship direct from this coast we can ship to either city at same rate. Consequently there will be a saving to you of freight if we ship to your city direct from here. Awaiting your reply, we are,
" ' Very truly,
" ' HORST BROTHERS.' "

"To this letter Roehm replied, under date of September 14, 1896:

"'Dear Sirs: In response to your letters dated 3d & 4th inst., state that before shipping me any hops always send me samples from which I can select lots, the same as you have been doing in the past.

"'Very truly,<br>"'John Roehm.'

"On October 9, 1896, Horst Brothers advised Roehm of twenty bales of hops per October delivery, as called for by the contract, which Roehm, by telegraph, refused to receive, and as supplementary thereto sent the following letter, dated October 24, 1896:

"'Gentlemen: Yours of October 9, enclosing bill of lading and bill of particulars per twenty bales of hops forwarded me under the terms of contract of August 23, 1893, was received, and I have wired you that I decline to receive the same. I notified you under date of June 27, 1896, that, owing to the dissolution of the copartnership with which I originally contracted and the fact that this firm was no longer in existence, I considered my contract at an end, and will make arrangements for purchasing my supplies elsewhere. I am advised that I am under no obligations by that contract to accept supplies from you. If you desire to bill these goods at the current market rate under a new contract, I will accept them if upon inspection they are of the quality desired; otherwise they will remain at the freight station subject to your order.

"'Very truly yours,<br>"'John Roehm.'

"No further efforts were made by Horst Brothers to make delivery under the contract, but in January, 1897, this suit was begun by all the original parties thereto, to the use of the firm as at present constituted, to recover damages for its breach. Judgment was rendered in favor of the plaintiffs."

The contention that Roehm was entitled to treat the contract as determined by the retirement of one of the members of the

firm of Horst Brothers, and the assignment of his interest to his copartners, was not renewed in this court.

*Mr. Samuel Dickson* for Roehm.　*Mr. R. O. Moon* and *Mr. Richard C. Dale* were on his brief.

*Mr. Frank P. Prichard* for Horst and others.　*Mr. John A. Garver* was on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is conceded that the contracts set out in the finding of facts were four of ten simultaneous contracts, for one hundred bales each, covering the furnishing of·one thousand bales of hops during a period of five years, of which six hundred bales had been delivered and paid for.　If the transaction could be treated as amounting to a single contract for one thousand bales, the breach alleged would have occurred while the contract was in the course of performance ; but plaintiffs' declaration or statement of demand averred the execution of the four contracts, " two for the purchase and sale of Pacific Coast hops of the crop of 1896, and two for the purchase and sale of Pacific Coast hops of the crop of 1897," set them out *in extenso*, and claimed recovery for breach thereof, and in this view of the case, while as to the first of the four contracts, the time to commence performance had arrived, and the October shipment had been tendered and refused, the breach as to the other three contracts was the refusal to perform before the time for performance had arrived.

The first contract falls within the rule that a contract may be broken by the renunciation of liability under it in the course of performance and suit may be immediately instituted.　But the other three contracts involve the question whether, where the contract is renounced before performance is due, and the renunciation goes to the whole contract, and is absolute and unequivocal, the injured party may treat the breach as complete and bring his action at once.　Defendant repudiated all

liability for hops of the crop of 1896 and of the crop of 1897, and notified plaintiffs that he should make (according to a letter of his attorney in the record that he had made) arrangements to purchase his stock of other parties, whereupon plaintiffs brought suit. The question is, therefore, presented, in respect of the three contracts, whether plaintiffs were entitled to sue at once or were obliged to wait until the time came for the first month's delivery under each of them.

It is not disputed that if one party to a contract has destroyed the subject-matter, or disabled himself so as to make performance impossible, his conduct is equivalent to a breach of the contract although the time for performance has not arrived; and also that if a contract provides for a series of acts, and actual default is made in the performance of one of them, accompanied by a refusal to perform the rest, the other party need not perform, but may treat the refusal as a breach of the entire contract, and recover accordingly.

And the doctrine that there may be an anticipatory breach of an executory contract by an absolute refusal to perform it, has become the settled law of England as applied to contracts for services, for marriage, and for the manufacture or sale of goods. The cases are extensively commented on in the notes to *Cutter* v. *Powell*, 2 Smith's Leading Cases, 1212, 1220, 9th edition by Richard Henn Collins and Arbuthnot. Some of these, though quite familiar, may well be referred to.

In *Hochster* v. *De la Tour*, 2 El. & Bl. 678, plaintiff, in April, 1852, had agreed to serve defendant, and defendant had undertaken to employ plaintiff, as courier, for three months from June first, on certain terms. On the eleventh of May, defendant wrote plaintiff that he had changed his mind, and declined to avail himself of plaintiff's services. Thereupon, and on May twenty-second, plaintiff brought an action at law for breach of contract in that defendant, before the said first of June, though plaintiff was always ready and willing to perform, refused to engage plaintiff or perform his promise, and then wrongfully exonerated plaintiff from the performance of the agreement, to his damage. And it was ruled that as there could be a breach of contract before the time fixed for performance, a positive and

absolute refusal to carry out the contract prior to the date of actual default amounted to such a breach.

In the course of the argument, Mr. Justice Crompton observed : " When a party announces his intention not to fulfill the contract, the other side may take him at his word and rescind the contract. The word ' rescind ' implies that both parties have agreed that the contract shall be at an end as if it had never been. But I am inclined to think that the party may also say : ' Since you have announced that you will not go on with the contract, I will consent that it shall be at an end from this time ; but I will hold you liable for the damage I have sustained ; and I will proceed to make that damage as little as possible by making the best use I can of my liberty.' "

In delivering the opinion of the court, (Campbell, C. J., Coleridge, Erle and Crompton, JJ.), Lord Campbell, after pointing out that at common law there were numerous cases in which an anticipatory act, such as an act rendering the contract impossible of performance, or disabling the party from performing it, would constitute a breach giving an immediate right of action, laid it down that a positive and unqualified refusal by one party to carry out the contract should be treated as belonging to the same category as such anticipatory acts, and said, p. 690 :

" But it is surely much more rational, and more for the benefit of both parties, that, after the renunciation of the agreement by the defendant, the plaintiff should be at liberty to consider himself absolved from any future performance of it, retaining his right to sue for any damage he has suffered from the breach of it. Thus, instead of remaining idle and laying out money in preparations which must be useless, he is at liberty to seek service under another employer, which would go in mitigation of the damages to which he would otherwise be entitled for a breach of the contract. It seems strange that the defendant, after renouncing the contract, and absolutely declaring that he will never act under it, should be permitted to object that faith is given to his assertion, and that an opportunity is not left to him of changing his mind. If the plaintiff is barred of any remedy by entering into an engagement inconsistent with starting as a courier with the defendant on the 1st of June, he is

prejudiced by putting faith in the defendant's assertion; and it would be more consonant with principle, if the defendant were precluded from saying that he had not broken the contract when he declared that he entirely renounced it.   Suppose that the defendant, at the time of his renunciation, had embarked on a voyage for Australia, so as to render it physically impossible for him to employ the plaintiff as a courier on the continent of Europe in the months of June, July and August, 1852; according to decided cases, the action might have been brought before the 1st of June; but the renunciation may have been founded on other facts, to be given in evidence, which would equally have rendered the defendant's performance of the contract impossible.  The man who wrongfully renounces a contract into which he has deliberately entered cannot justly complain if he is immediately sued for a compensation in damages by the man whom he has injured; and it seems reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding for the exercise of this option, which may be advantageous to the innocent party, and cannot be prejudicial to the wrongdoer.   An argument against the action before the 1st of June is urged from the difficulty of calculating the damages : but this argument is equally strong against an action before the 1st of September, when the three months would expire.   In either case, the jury in assessing the damages would be justified in looking to all that had happened, or was likely to happen, to increase or mitigate the loss of the plaintiff down to the day of trial.   We do not find any decision contrary to the view we are taking of this case."

In *Frost* v. *Knight*, L. R. 7 Ex. 111, defendant had promised to marry plaintiff so soon as his (defendant's) father should die. While his father was yet alive he absolutely refused to marry plaintiff, and it was held in the Exchequer Chamber, overruling the decision of the Court of Exchequer, L. R. 5 Ex. 322, that for this breach an action was well brought during the father's lifetime.  Cockburn, C. J., said : " The law with reference to a contract to be performed at a future time, where the party bound to performance announces prior to the time his intention

not to perform it, as established by the cases of *Hochster* v. *De la Tour*, 2 E. & B. 678, and the *Danube & Black Sea Company* v. *Xenos*, 13 C. B. (N. S.) 825, on the one hand, and *Avery* v. *Bowden*, 5 E. & B. 714, *Reid* v. *Hoskins*, 6 E. & B. 953, and *Barwick* v. *Buba*, 2 C. B. (N. S.) 563, on the other, may be thus stated. The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the nonperformance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss."

The case of *Danube Company* v. *Xenos*, 11 C. B. (N. S.) 152, is stated in the headnotes thus: On the 9th of July, A, by his agent, agreed to receive certain goods of B on board his ship to be carried to a foreign port, — the shipment to commence on the 1st of August. On the 21st of July A wrote to B, stating that he did not hold himself responsible for the contract, the agent having no authority to make it; and on the 23d he wrote again offering a substituted contract, but still repudiating the original contract. B by his attorneys gave A notice that he should hold him bound by the original contract, and that, if he persisted in refusing to perform it, he (B) should forthwith proceed to make other arrangements for forwarding the goods to their destination, and look to him for any loss. On the 1st of August, A again wrote to B, stating that he was then prepared to receive the goods on board his ship, making no allusion to

the original contract. B had, however, in the meantime entered into a negotiation with one S for the conveyance of the goods by another ship, which negotiation ended in a contract for that purpose with S on the 2d of August. B thereupon sued A for refusing to receive the goods pursuant to his contract; and A brought a cross action against B for refusing to ship. Upon a special case stating these facts: Held, that it was competent to A to treat B's renunciation as a breach of the contract; and that the fact of such renunciation afforded a good answer to the cross action of A, and sustained B's plea that before breach A discharged him from the performance of the agreement.

Erle, C. J., said (p. 175): " In *Cort* v. *Ambergate Railway Company*, 17 Q. B. 127, it was held, that, upon the company giving notice to Mr. Cort that they would not receive any more of his chairs, he might abstain from manufacturing them, and sue the company for the breach of contract without tendering the goods for their acceptance. So, in *Hochster* v. *De la Tour*, 2 El. & Bl. 678, it was held that the courier whose services were engaged for a period to commence from a future day, being told before that day that they would not be accepted, was at liberty to treat that as a complete breach, and to hire himself to another party. And the boundary is equally well ascertained on the other side. Thus, in *Avery* v. *Bowden*, 5 El. & Bl. 714; 6 El. & Bl. 953, where the agent of the charterer intimated to the captain, that, in consequence of the breaking out of the war, he would be unable to furnish him with a cargo, and wished the captain to sail away, and the latter did not do so, it was held not to fall within the principle already adverted to, and not to amount to a breach or renunciation of the contract. But where there is an explicit declaration by the one party of his intention not to perform the contract on his part, which is accepted by the other as a breach of the contract, that beyond all doubt affords a cause of action."

The case was heard on error in the Exchequer Chamber before Cockburn, C. J., Pollock, C. B., Wightman, J., Crompton, J., Channel, B., and Wilde, B; and the judgment of the Common Pleas was unanimously affirmed.. 13 C. B. (N. S.) 825.

In *Johnstone* v. *Milling*, 16 Q. B. Div. 467, Lord Esher, Mas-

ter of the Rolls, puts the principle thus : " When one party assumes to renounce the contract, that is, by anticipation refuses to perform it, he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such a renunciation does not of course amount to a rescission of the contract, because one party to a contract cannot by himself rescind it, but by wrongfully making such a renunciation of the contract he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission. The other party may adopt such renunciation of the contract by so acting upon it as in effect to declare that he too treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation."

Lord Justice Bowen said (p. 472): " We have, therefore, to consider upon what principles and under what circumstances it must be held that a promisee, who finds himself confronted with a declaration of intention by the promisor not to carry out the contract when the time for performance arrives, may treat the contract as broken, and sue for a breach thereof. It would seem on principle that the declaration of such intention by the promisor is not in itself and unless acted on by the promisee a breach of the contract; and that it only becomes a breach when it is converted by force of what follows it into a wrongful renunciation of the contract. Its real operation appears to be to give the promisee the right of electing either to treat the declaration as *brutum fulmen*, and holding fast to the contract, to wait till the time for its performance has arrived, or to act upon it, and treat it as a final assertion by the promisor that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered. But such declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect, it becomes a breach of contract, and he can recover upon it as such."

The doctrine which thus obtains in England has been almost universally accepted by the courts of this country, although the precise point has not been ruled by this court.

In *Smoot's Case*, 15 Wall. 36, 48, Mr. Justice Miller observed: "In the case of *Philpotts* v. *Evans*, 5 M. & W. 475, the defendant, who had agreed to receive and pay for wheat, notified the plaintiff, before the time of delivery, that he would not receive it. The plaintiff tendered the wheat at the proper time, and the only question raised was, whether the measure of damages should be governed by the price of the wheat at the time of the notice or at the time of the tender. Baron Parke said: ' I think no action would have lain for the breach of the contract at the time of the notice, but that plaintiff was bound to wait until the time of delivery to see whether the defendant would then receive it. The defendant might. have chosen to take it and would have been guilty of no breach of contract. His contract was not broken by his previous declaration that he would not accept.' And though some of the judges in the subsequent case of *Hochster* v. *De la Tour*, 2 El. & Bl. 678, disapprove very properly of the extreme ground taken by Baron Parke, they all agree that the refusal to accept, on the part of the defendant, in such case, must be absolute and unequivocal and must have been acted on by the plaintiff."

In *Lovell* v. *St. Louis Life Insurance Company*, 111 U. S. 264, a life insurance company had terminated its business and transferred its assets and policies to another company, and the court held that this in itself authorized the insured to treat the contract as at an end, and to sue to recover back the premiums already paid, although the time for the performance of the obligation of the insurance company, to wit, the death of the insured, had not arrived. Mr. Justice Bradley, delivering the opinion of the court, said: " Our third conclusion is, that as the old company totally abandoned the performance of its contract with the complainant by transferring all its assets and obligations to the new company, and as the contract is executory in its nature, the complainant had a right to consider it as determined by the act of the company, and to demand what was justly due to him in that exigency. Of this we think there can be no doubt. Where one party to an executory contract prevents the performance of it, or puts it out of his power to per-

form it, the other party may regard it as terminated and demand whatever damages he has sustained thereby."

In *Dingley* v. *Oler*, 117 U. S. 490, it was held that the case did not come within the rule laid down in *Hochster* v. *De la Tour*, but within *Avery* v. *Bowden* and *Johnstone* v. *Milling*, since, in the view entertained by the court, there was not a renunciation of the contract by a total refusal to perform.

So in *Cleveland Rolling Mill* v. *Rhodes*, 121 U. S. 255, 264, involving a contract for the delivery of iron ore, the court said: " The necessary conclusion is that the defendant was justified in refusing to accept any of the iron shipped in 1881; and whether the notice, previously given by the defendant to the plaintiff, that it would not accept under the contract any iron made after December 31, 1880, might have been treated by the plaintiffs as a renunciation and a breach of the contract, need not be considered, because the plaintiffs did not act upon it as such."

In *Anvil Mining Company* v. *Humble*, 153 U. S. 540, performance had been commenced, but completion was prevented by defendant, and Mr. Justice Brewer, speaking for the court, said: " Whenever one party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken and desist from any further effort on his part to perform; in other words, he may abandon it, and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrongdoing of the other party has brought about."

In *Pierce* v. *Tennessee Coal & Railroad Company*, 173 U. S. 1, it was held that on discharge from a contract of employment, the party discharged might elect to treat the contract as absolutely and finally broken, and in an action to recover the full value of the contract to him at the time of the breach, including all that he would have received in the future as well as in the past, deducting any sum that he might have earned or that he might thereafter earn; and Mr. Justice Gray said : " The plaintiff was not bound to wait to see if the defendant would change its decision and take him back into its service; or to resort to

successive actions for damages from time to time; or to leave the whole of his damages to be recovered by his personal representatives after his death. But he had the right to elect to treat the contract as absolutely and finally broken by the defendant; to maintain this action, once for all, as for a total breach of the entire contract."

In *Hancock* v. *New York Life Insurance Company*, 11 Fed. Cas. 402, *Hochster* v. *De la Tour* was followed by Bond, J., in the Circuit Court for the Eastern District of Virginia; and in *Grau* v. *McVicker*, 8 Biss. 13, Drummond, J., fully approved of the principles decided in that case, and remarked: "It seems to me that it is the better rule to hold that the party who has refused to perform his contract is liable at once to an action, and that whatever arises afterwards or may arise in consequence of the time not having come or not having expired, should be considered in estimating the damages."

Again, in *Dingley* v. *Oler*, 11 Fed. Rep. 372, Lowell, J., applied the rule in the Circuit Court for the District of Maine, and, after citing *Hochster* v. *De la Tour*, *Frost* v. *Knight*, and other cases, said: "These cases seem to me to be founded in good sense, and to rest on strong grounds of convenience, however difficult it may be to reconcile them with the strictest logic." And see *Foss Brewing Company* v. *Bullock*, 16 U. S. App. 311; *Hines Lumber Company* v. *Alley*, 43 U. S. App. 169; *Marks* v. *Van Eeghen*, 57 U. S. App. 149.

The great weight of authority in the state courts is to the same effect, as will appear by reference to the cases cited in the margin.[1]

On the other hand, in *Greenway* v. *Gaither*, Taney, 227,

---

[1] *Fox* v. *Kitton*, 19 Ill. 518; *Kadish* v. *Young*, 108 Ill. 170; *Roebling's Sons' Co.* v. *Lock Co.*, 130 Ill. 660; *Lake Shore R. R. Co.* v. *Richards*, 152 Ill. 59; *Burtis* v. *Thompson*, 42 N. Y. 246; *Windmuller* v. *Pope*, 107 N. Y. 674; *Mountjoy* v. *Metzger*, 9 Phila. 10; *Zuck* v. *McClure*, 98 Penn. St. 541; *Hocking* v. *Hamilton*, 158 Penn. St. 107; *Dugan* v. *Anderson*, 36 Maryland, 567; *Hosmer* v. *Wilson*, 7 Michigan, 294; *Platt* v. *Brand*, 26 Michigan, 173; *Crabtree* v. *Messersmith*, 19 Iowa, 179; *McCormick* v. *Basal*, 46 Iowa, 235; *Kurtz* v. *Frank*, 76 Indiana, 594; *Cobb* v. *Hall*, 33 Vermont, 233; *Davis* v. *Grand Rapids Co.*, 41 W. Va. 717; and other cases cited in the text books and encyclopædias.

Mr. Chief Justice Taney sitting on circuit in Maryland, declined to apply the rule in that particular case. The cause was tried in November, 1851, and more than two years after, at November term, 1853, application was made to the Chief Justice to seal a bill of exceptions. *Hochster* v. *De la Tour* was decided in June, 1853, and the decision of the Circuit Court had apparently been contrary to the rule laid down in that case. The Chief Justice refused to seal the bill, chiefly on the ground that under the circumstances the application came too late, but also on the ground that there was no error, as the rule was only applicable to contracts of the special character involved in that case, and the Chief Justice said as to the contract in hand, by which defendant engaged to pay certain sums of money on certain days: " It has never been supposed that notice to the holder of a bond, or a promissory note, or bill of exchange, that the party would not (from any cause) comply with the contract, would give to the holder an immediate cause of action, upon which he might sue before the time of payment arrived."

The rule is disapproved in *Daniels* v. *Newton*, 114 Mass. 530, and in *Stanford* v. *McGill*, 6 N. Dak. 536, on elaborate consideration. The opinion of Judge Wells in *Daniels* v. *Newton* is generally regarded as containing all that could be said in opposition to the decision of *Hochster* v. *De la Tour*, and one of the propositions on which the opinion rests is that the adoption of the rule in the instance of ordinary contracts would necessitate its adoption in the case of commercial paper. But we are unable to assent to that view. In the case of an ordinary money contract, such as a promissory note, or a bond, the consideration has passed ; there are no mutual obligations ; and cases of that sort do not fall within the reason of the rule.

In *Nichols* v. *Scranton Steel Company*, 137 N. Y. 471, 487, Mr. Justice Peckham, then a member of the Court of Appeals of New York, thus expresses the distinction : " It is not intimated that in the bald case of a party bound to pay a promissory note which rests in the hands of the payee, but which is not yet due, such note can be made due by any notice of the maker that he does not intend to pay it when it matures. We decide simply this case where there are material provisions and

obligations interdependent. In such case, and where one party is bound, from time to time, as expressed, to deliver part of an aggregate and specified amount of property to another, who is to pay for each parcel delivered at a certain time and in a certain way, a refusal to be further bound by the terms of the contract or to accept further deliveries, and a refusal to give the notes already demandable for a portion of the property that has been delivered, and a refusal to give any more notes at any time or for any purpose in the future, or to pay moneys at any time, which are eventually to be paid under the contract, all this constitutes a breach of the contract as a whole, and gives a present right of action against the party so refusing to recover damages which the other may sustain by reason of this refusal."

We think it obvious that both as to renunciation after commencement of performance and renunciation before the time for performance has arrived, money contracts, pure and simple, stand on a different footing from executory contracts for the purchase and sale of goods.

The other proposition on which the case of *Daniels* v. *Newton* was rested is that until the time for performance arrives, neither contracting party can suffer any injury which can form a ground of damages. Wells, J., said: "An executory contract ordinarily affords no title or interest in the subject matter of the agreement. Until the time arrives when, by the terms of the agreement he is or might be entitled to its performance, he can suffer no injury or deprivation which can form a ground of damages. There is neither violation of right, nor loss upon which to found an action."

But there are many cases in which before the time fixed for performance, one of the contracting parties may do that which amounts to a breach and furnishes a ground of damages. It has always been the law that where a party deliberately incapacitates himself or renders performance of his contract impossible, his act amounts to an injury to the other party, which gives the other party a cause of action for breach of contract; yet this would seem to be inconsistent with the reasoning in *Daniels* v. *Newton*, though it is not there in terms decided "that

an absolute refusal to perform a contract, after the time and under the conditions in which plaintiff is entitled to require performance, is not a breach of the contract, even although the contract is by its terms to continue in the future." *Parker* v. *Russell*, 133 Mass. 874.

In truth, the opinion goes upon a distinction between cases of renunciation before the arrival of the time of performance and those of renunciation of unmatured obligations of a contract while it is in course of performance, and it is said that before the argument on the ground of convenience and mutual advantage to the parties can properly have weight, " the point to be reached must first be shown to be consistent with logical deductions from the strictly legal aspects of the case."

We think that there can be no controlling distinction on this point between the two classes of cases, and that it is proper to consider the reasonableness of the conclusion that the absolute renunciation of particular contracts constitutes such a breach as to justify immediate action and recovery therefor. The parties to a contract which is wholly executory have a right to the maintenance of the contractual relations up to the time for performance, as well as to a performance of the contract when due. If it appear that the party who makes an absolute refusal intends thereby to put an end to the contract so far as performance is concerned, and that the other party must accept this position, why should there not be speedy action and settlement in regard to the rights of the parties? Why should a *locus penitentiæ* be awarded to the party whose wrongful action has placed the other at such disadvantage? What reasonable distinction *per se* is there between liability for a refusal to perform future acts to be done under a contract in course of performance and liability for a refusal to perform the whole contract made before the time for commencement of performance?

As Lord Chief Justice Cockburn observed, in *Frost* v. *Knight*, the promisee has the right to insist on the contract as subsisting and effective before the arrival of the time for its performance, and its unimpaired and unimpeached efficacy may be essential to his interests, dealing as he may with rights acquired under it in various ways for his benefit and advantage. And of all

such advantage, the repudiation of the contract by the other party, and the announcement that it never will be fulfilled, must of course deprive him. While by acting on such repudiation and the taking of timely measures, the promisee may in many cases avert, or, at all events, materially lessen the injurious effects which would otherwise flow from the nonfulfillment of the contract.

During the argument of *Cort* v. *Ambergate Railway Company*, 17 Q. B. 127, Erle, J., made this suggestion : " Suppose the contract was that plaintiff should send a ship to a certain port for a cargo, and defendant should there load one on board ; but defendant wrote word that he could not furnish a cargo ; must the ship be sent to return empty ? " And if it was not necessary for the ship owner to send his ship, it is not perceived why he should be compelled to wait until the time fixed for the loading of the ship at the remote port before bringing suit upon the contract.

If in this case these ten hop contracts had been written into one contract for the supply of hops for five years in instalments, then when the default happened in October, 1896, it cannot be denied that an immediate action could have been brought in which damages could have been recovered in advance for the breach of the agreement to deliver during the two remaining years. But treating the four outstanding contracts as separate contracts, why is it not equally reasonable that an unqualified and positive refusal to perform them constitutes such a breach that damages could be recovered in an immediate action ? Why should plaintiff be compelled to bring four suits instead of one ? For the reasons above stated, and having reference to the state of the authorities on the subject, our conclusion is that the rule laid down in *Hochster* v. *De la Tour* is a reasonable and proper rule to be applied in this case and in many others arising out of the transactions of commerce of the present day.

As to the question of damages, if the action is not premature, the rule is applicable that plaintiff is entitled to compensation based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by

reason of circumstances of which he ought reasonably to have availed himself. If a vendor is to manufacture goods, and during the process of manufacture the contract is repudiated, he is not bound to complete the manufacture, and estimate his damages by the difference between the market price and the contract price, but the measure of damage is the difference between the contract price and the cost of performance. *Hinckley* v. *Pittsburg Company*, 121 U. S. 264. Even if in such cases the manufacturer actually obtains his profits before the time fixed for performance, and recovers on a basis of cost which might have been increased or diminished by subsequent events, the party who broke the contract before the time for complete performance cannot complain, for he took the risk involved in such anticipation. If the vendor has to buy instead of to manufacture, the same principle prevails, and he may show what was the value of the contract by showing for what price he could have made subcontracts, just as the cost of manufacture in the case of a manufacturer may be shown. Although he may receive his money earlier in this way, and may gain, or lose, by the estimation of his damage in advance of the time for performance, still, as we have seen, he has the right to accept the situation tendered him, and the other party cannot complain.

In this case plaintiffs showed at what prices they could have made subcontracts for forward deliveries according to the contracts in suit, and the difference between the prices fixed by the contracts sued on and those was correctly allowed.

*Judgment affirmed.*