**In re BANKERS MORTG. CO. OF TOPEKA, KAN.**

**AMORTIBANC INV. CO. et al. v. SHAW.**

No. 1390.

Circuit Court of Appeals, Tenth Circuit.
April 11, 1936.

Robert L. Webb, of Topeka, Kan. (Robert Stone, James A. McClure, Beryl R. Johnson, and Ralph W. Oman, all of Topeka, Kan., on the brief), for appellant Bankers Mortg. Co.

John L. Hunt, of Topeka, Kan., for appellant Amortibanc Inv. Co.

Harry K. Allen, of Topeka, Kan., for appellant Ernest Dyerly.

T. M. Lillard and Philip H. Lewis, both of Topeka, Kan. (O. B. Eidson, of Topeka, Kan., on the brief), for appellant Frank L. Campbell, trustee.

Hugh MacFarland, of Topeka, Kan., for Hilda Shaw.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

The Bankers Mortgage Company is a corporation organized under the laws of Kansas. At all times hereinafter mentioned, the amount of its paid up capital exceeded $100,000. It is authorized to issue savings bonds and deal in mortgages and other securities.

It issued three types of bonds:

1. Installment bonds on which the purchaser made an initial payment and payments at stated times thereafter.

2. Single payment bonds on which the purchaser made a payment on the date of issue, sufficient when compound interest was added to the date of maturity, to equal the amount of the bond.

3. Coupons bonds for which the purchaser paid the full amount of the bond and was entitled to draw interest as provided in the coupons attached to the bond.

The bonds contained tables of cash surrender and loan values available after certain specified amounts had been paid thereon.

Due to a threatened investigation by the state of the company's affairs, its directors, on May 3, 1933, directed that no further applications for purchase of bonds should be accepted.

On May 27, 1933, a receiver was appointed in an equity proceeding brought by two of the bondholders in the United States District Court for the District of Kansas. The facts relating to that proceeding were stated in Bankers' Mortgage Company of Topeka v. Rupp (C.C.A. 10) 66 F.(2d) 992.

The order appointing the receiver, in part read as follows:

"Now, Therefore, It Is Ordered; that the application of the plaintiffs for the appointment of a receiver for the defendant corporation be sustained and that C. B. Dodge and N. J. Ward be and they are hereby appointed receivers of said defendant corporation to take charge and possession of the offices of said defendant corporation, its books, records, accounts and assets and to manage in all respects the affairs of said corporation, its properties and assets, and continue the business of the corporation until the further order of this court or the judge thereof."

On June 15, 1933, the court entered an order in the receivership proceeding which in part read as follows:

"It is, further, ordered that said receivers not pay any maturities or demands for cash surrenders or loans or other liabilities upon bonds until further order of court."

On May 18, 1935, the trial court approved an involuntary petition filed under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207) and on May 20, 1935, appointed Campbell trustee. This court affirmed the two orders last mentioned in Humphrey v. Bankers Mortgage Company of Topeka, Kansas (C.C.A.10) 79 F.(2d) 345.

These appeals involve the rights of three classes of claimants.

Class one comprises a large group of bondholders who, prior to May 27, 1933, had made sufficient payments to entitle them to cash surrender values on their bonds. The payments made on each of these bonds, except in a relatively few instances, in the aggregate exceed the cash surrender value thereof. The total of the cash surrender values of these bonds is now $1,075,146.90.

Class two comprises a large group of bondholders who, prior to May 27, 1933, had made substantial payments, but not sufficient to entitle them to cash surrender values on their bonds. All the members of this group had paid installments within a period of two years immediately prior to May 27, 1933, and were then entitled to the reinstatement privilege provided for by the following provision in their bonds:

"Reinstatement. At any time within two years from the date of default the holder hereof may reinstate this Bond by resuming payments. Interest will not be allowed hereon while in default, and in case of such reinstatement the maturity hereof and the due date of the remaining payments, respectively is extended for a period equal to the time the default continued."

Certain members of this class had made their installment payments regularly up to May 27, 1933.

Class three comprises a group of bond-holders who had made some payments on their bonds, but had been in default for more than two years prior to May 27, 1933. Their rights, if any, rest on a nonforfeiture provision in their bonds reading as follows:

"Non-Forfeiture Clause. Notwithstanding that default has continued for two years or more, the rights of the second party are not forfeited, but said second party, so long as the company is engaged in issuing like Bonds, upon the resumption of payments and upon written request and surrender of this Bond and the payment of a reissuance charge of $1.00 shall be entitled to a new installment Bond of the kind and rate then being issued and all payments made hereon shall be credited on said new Bonds, provided that no part thereof shall be construed to be advance payments. Provided, further, that such new Bond shall be the same in its terms and conditions as other Bonds then being issued on original applications except that after all payments have been made and said new Bond would otherwise mature, the maturity date of such new Bond and the time when said Company shall be required to pay same, shall be postponed for one year, the amount to be paid, however, not being increased by such postponement. Provided, further, that if this Bond has not attained a paid-up bond option and default continues for a period of two years, then except as to the right to receive a new Bond with payments credited thereon, all rights of the second party shall cease and determine and this Bond shall be of no further force and effect."

None of the members of this class had complied or offered to comply with the requirements of such clause prior to May 27, 1933.

The company has not been engaged in issuing bonds like those held by members of this class at any time since May 3, 1933.

Respecting the financial condition of the company, the trial court found:

"A thorough and painstaking appraisal of the assets of the Bankers Mortgage Company and its property has been made by a competent appraiser whose appointment was agreed to by the parties, and whose appraisement was made under instructions of the court, likewise agreed to. That appraisement included an inspection of all property upon which the company held a mortgage, by competent appraisers in the community where the property is located, together with a study of the property and present or prospective earnings. Dun & Bradstreet have made a special report upon the responsibility of the various mortgagors. In computing values of mortgages of the company, men long in the mortgage loan business have been consulted and the benefit of their opinions obtained. This appraisal took three months and was completed at considerable expense. It has been as accurately and fairly done as could be. I therefore find the fair value of the assets of The Bankers Mortgage Company to be as reported in the appraisement, to-wit, $887,169.26.

"The minimum indebtedness of the company under any possible theory of law is:

| | |
|---|---:|
| Surrender value of bonds outstanding... | $1,075,146.90 |
| General indebtedness ...................... | 34,042.00 |
| Estimated cost of ancillary receiverships and main receivership, including allowances unpaid ........................... | 50,000.00 |
| Reserve set up on the company's books against liability on bonds upon which no surrender value had accrued....... | 245,795.42 |
| Total Indebtedness .................... | $1,404,984.32 |
| Total Assets ........................ | 887,169.26 |
| | $ 517,815.06 |

"With reference to the item of reserve, I find that the company charged itself, on its books, with a reserve at the date of the appointment of the receivers of $647,118.40. Calculated on the basis of bonds now outstanding, the present reserve carried on the books bears the same proportionate ratio to the outstanding bonds that the reserve carried on May 27, 1933, bore to the then outstanding bonds. The amount seems pitifully inadequate to protect investors for the margin between the surrender value on the bonds and the large sums paid in prior to maturity. By the acknowledgment by the company on its own records of account it seems safe to accept this amount as a minimum. * * *

"I find the Company insolvent."

A consideration of the entire record leads to the conclusion that the company was insolvent and unable to respond to its obligation to pay cash surrender values on its bonds, on and continuously after May 27, 1933. Furthermore, the court entered an order shortly thereafter directing the receiver to discontinue paying cash surrender values. None have been paid in cash since that order. The bond contracts were mutually executory. The trial court held

there was an anticipatory breach by the company of each of its bond contracts on May 27, 1933.

In Central Trust Co. v. Chicago Auditorium Ass'n, 240 U.S. 581, 589, 36 S.Ct. 412, 414, 60 L.Ed. 811, the court said:

"It is no longer open to question in this court that, as a rule, where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach. The rule has its exceptions, but none that now concerns us. Roehm v. Horst, 178 U.S. 1, 18, 19, 20 S.Ct. 780, 44 L.Ed. 953, 960, 961. And see O'Neill v. Supreme Council, 70 N.J.Law, 410, 412, 57 A. 463, 1 Ann.Cas. 422. There is no doubt that the same rule must be applied where a similar repudiation or disablement occurs during performance. * * *

"Commercial credits are, to a large extent, based upon the reasonable expectation that pending contracts of acknowledged validity will be performed in due course; and the same principle that entitles the promisee to continued willingness entitles him to continued ability on the part of the promisor. In short, it must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or acts of bankruptcy, to be disabled from making performance; and, in this view, bankruptcy proceedings are but the natural and legal consequence of something done or omitted to be done by the bankrupt, in violation of his engagement."

See, also, Operators' Oil Co. v. Barbre (C.C.A.10) 65 F.(2d) 857, 861.

■ We are of the opinion that the financial condition of the company, its inability to meet its obligations under the bonds, the receivership brought on by its mismanagement and the order of the court to discontinue paying cash surrender values on its bonds, together constituted an anticipatory breach of the bond contracts.

■ It follows the bondholders could sue for damages without continuing to perform.[1]

The trial court held the measure of damages was the amount of money paid in by the bondholder plus legal interest. Its conclusion is supported by Lovell v. St. Louis Mutual Life Ins. Co. et al., 111 U.S. 264, 4 S.Ct. 390, 28 L.Ed. 423. There the St. Louis Mutual Life Insurance Company had issued its policy of life insurance to the plaintiff. Thereafter the Mutual Company transferred all its assets to the St. Louis Life Insurance Company. The court held the Mutual Company by so transferring its assets, disabled itself to perform the contract and committed an anticipatory breach; that the plaintiff had the right to treat the contract at an end and sue for his damages; and that the measure of his damages was the amount he had paid, less the value of the insurance protection he had received, with interest.

■ It is suggested that some of the bonds have insurance provisions. They simply provide that in the event of disability or death of the bondholder, the company, on surrender of the bond, will pay back the amount paid thereon with interest. We are unable to see any insurance value in such a provision.

The right of the members of class one to have their claims allowed is conceded.

■ Members in class two had the privilege of resuming payments when the anticipatory breach occurred. The only effect of their failure to pay maturing installments was to postpone the due dates of the bonds and the due dates of the remaining payments for a period equal to the time they failed to make their monthly payments. The reinstatement provision was in effect, an automatic extension, conditioned only on the resumption of payments within two years from the date of the last payment.

■ The anticipatory breach excused them from resuming payments. In computing interest on their claims, however, the period they were in default should be excluded.

[1] Bu-Vi-Bar Petroleum Corporation v. Krow (C.C.A.10) 40 F.(2d) 488, 490, 491, 69 A.L.R. 1295; Lovell v. St. Louis Mutual Life Ins. Co., 111 U.S. 264, 272, 4 S.Ct. 390, 28 L.Ed. 423; Central Trust Co. v. Chicago Auditorium Association, 240 U.S. 581, 589, 36 S.Ct. 412, 60 L.Ed. 811; Roehm v. Horst, 178 U.S. 1, 14, 15, 20 S.Ct. 780, 44 L.Ed. 953; Operators' Oil Co. v. Barbre (C.C.A.10) 65 F.(2d) 857, 861; Williston on Contracts, vol. 3, § 1317.

The rights of members in class three were conditional. None of the conditions were fulfilled. They have not resumed payments, surrendered their old bonds, paid the reissuance charge, or requested in writing the issuance of new installment bonds. A further condition to their right to secure new bonds has been nonexistent since May 3, 1933; the company suspended the sale of bonds on that date, and it was not "engaged in issuing like bonds" as those held by members of this class on May 27, 1933, nor has it been so engaged at any time since. Hence members of this class were not entitled to receive new bonds and by the express provisions of the nonforfeiture clause, all their rights had ceased and determined and their bonds were of "no further force and effect."

Section 5, c. 140, Laws Kan. 1929, in part reads as follows:

"The following classes of securities shall be entitled to registration by notification in the manner provided in this section:
* * *

"(8) Bonds, certificates or contracts, by whatever name known or called, in fixed and stipulated installments, issued and sold by any corporation having a paid-up capital of at least $100,000 which shall deposit with the bank commissioner, or with a trustee to be approved by the bank commissioner, securities approved by the bank commissioner amounting to at least $50,-000, and shall maintain at all times a deposit with said bank commissioner or said trustee, securities in good standing and not in default approved by the bank commissioner to an amount equal to at least one hundred per cent, but not to exceed one hundred twenty per cent, of the liability on all outstanding contracts sold and held in this state."

The company deposited securities with the Bank Commissioner in compliance therewith. Their custody subsequently passed to the State Corporation Commission. See sections 17—1229, 74—601b, R.S.Kans.Supp.1933; State v. State Corporation Commission, 138 Kan. 159, 23 P. (2d) 606.

In Meyers v. Kansas State Corporation Commission, 139 Kan. 890, 33 P.(2d) 308, the court held where an equity receiver has been appointed for the company that made the deposit, such receiver is a proper official to receive and liquidate such securities for the benefit of the bondholders. Accordingly, in July, 1934, the Corporation Commission turned such securities over to the receiver in the equity suit.

In 1922, the company was authorized by resolution of the Blue Sky Department of the state of Kansas, to sell its bonds in that state and a permit was issued to the company.

On September 16, 1929, the resolution was amended so as to read in part as follows:

"That said corporation shall at all times keep on deposit with the bank commissioner and assigned to him or (and) his successors in office, sufficient first mortgage loans on improved real estate, government or municipal bonds, approved by the bank commissioner in an amount at least 10% in excess of its outstanding liabilities, except that should this company be required by the officials or authorities of any other state or states to deposit mortgages or such securities to cover its liability upon its bonds sold therein, said company shall not be required to deposit in Kansas, securities to cover its liability upon its bonds sold therein, said company shall not be required to deposit in Kansas, securities covering such liability in other state or states; but in lieu thereof shall deposit with the bank commissioner of the State of Kansas, a duplicate receipt of the mortgages or securities so deposited in such other state or states, provided that its liability on all its bonds shall for the purpose of determining the amount of these deposits be construed to be not less than the amount specified in the table of cash or loan surrender values embodied in said bonds."

On July 26, 1934, the amount and character of such securities were as follows:

| | |
|---|---:|
| Mortgages | $1,545,430.72 |
| Sheriffs' Certificates | 92,100.00 |
| Deeds Properly Assigned | 47,750.00 |
| Home Owners' Loan Corporation bonds | 33,900.00 |
| Total | $1,719,180.72 |

The company and the class one bondholders contend the securities were deposited solely to secure the payment of cash surrender values and that they should be applied solely in liquidation of the claims of bondholders in that class.

On the bonds issued up to September 26, 1927, but not thereafter, the Bank Commissioner placed the following endorsement:

"This bond is registered in this Department and is secured by a pledge of first

mortgages on real estate, or other securities, properly assigned, in an amount of $110.00, for each $100.00 of liability of this Company, based on the cash surrender value shown herein."

While the various series of bonds differed slightly in phraseology, we think the following provisions of a Series B and a Series F Bond sufficiently illustrate their terms:

### Series B

"As security for the performance of every obligation of The Bankers Mortgage Company hereunder it will hold intact, subject to constant examination and inspection, first mortgages on improved real estate, in an amount equal to at least $110.00 for each $100.00 of its liability hereunder less the amount of any loans made on bonds as hereinafter provided for, to be held intact as Specific Security for this and like bonds, or any bonds issued in lieu thereof. * * *

"1. Investment of Funds. This Bond and like Bonds are secured by first mortgages on improved real estate to an amount equal to the cash surrender value, for the period paid for, set out in column 2 in the Table of Guarantees in paragraph 11. * * *

"2. Loan Value. After the end of the second year from the date of this Bond, if not in default, upon deposit of this Bond as collateral security the company will loan the registered owner hereof the amount set forth under the Loan or Cash Surrender Values in column 2 of the Table of Guarantees in paragraph 11. * * *

"4. Cash Surrender Value. This Bond shall have a cash surrender value after the end of the second year, if not in default, for the period paid for as per column 2 in the Table of Guarantees in paragraph 11. * * *

"The liability of the company for the purpose of computing the security required for each one thousand ($1,000) dollars of this Bond upon which payments have been made for two or more years in advance, shall at the end of each year paid for, be as per column 2 in the Table of Guarantees in paragraph 11. * * *

"Any payment in excess of seventy-two ($72.00) dollars per year in advance per thousand shall increase the cash surrender value and the company's liability in an amount equal to such payments and accumulated interest at the rate of six per cent per annum compounded annually, but such excess payments shall be applied by the company on annual payments when they become due. * * *

"There is no obligation and no liability either on the part of the owner of this Bond or on the part of the company to pay any sum hereunder except those expressly specified. For the purpose of determining the sufficiency of the company's assets to carry out its obligations, as well as for ascertaining the amount of the securities to be maintained, the surrender value for each year as given in column 2 of the Table of Guarantees in paragraph 11, shall be taken as the true value to the owner and as the measure of the company's liability on this Bond in each such year. * * *"

### Series F

"The above cash value shall be attained one hundred eighty months from date hereof, if payments are made regularly according to the provisions hereof.

"Prior to said time the optional settlement shall be as set forth in the table in paragraph 6 at page 2 of this bond. * * *

"This bond is subject to the privileges, terms and conditions as set forth on the second, third and fourth pages hereof, which are hereby referred to and made a part hereof, as fully as if set forth in the face of this bond. * * *

"1. Security. This bond is the direct obligation of The Bankers Mortgage Company of Topeka, Kansas, and is registered with the Bank Commissioner of the State of Kansas, said Company is required by the Charter Board of the State of Kansas, consisting of the Attorney General, the Secretary of State and the Bank Commissioner, to keep at all times on deposit as collateral security, first mortgages on improved real estate, cash, government and municipal bonds and other securities that qualify for investments of life insurance companies under the laws of the State of New York, in an amount at least 10% in excess of its liabilities on this and all other like and outstanding bonds issued by it, together with at least 100% of the amount of advance payments made on such bonds, less the amount of any loan made thereon.

"Funds derived from this and like bonds are invested in first mortgages on improved real estate, cash, government and municipal bonds and other securities that qualify for investments of life insurance companies under the laws of the State of

New York. Said mortgages are inspected and approved by a representative of the Charter Board and are assigned to and deposited with the Bank Commissioner and his successors in office, in an amount at least $110 for each $100 of the company's liability on this and like bonds and 100% of advance payments until said bonds are paid by The Bankers Mortgage Company. * * *

"6. Optional Settlements Prior to Maturity. After this bond has been in force for any one of the periods shown in the following schedule, exclusive of any period or periods of default, the second party, upon written request and surrender of this bond may elect to receive in cash based on a $3.75 monthly payment, the sums shown in the following schedule, less any indebtedness secured by this bond: * * *

"7. Loan Privilege. The company will loan at any time, upon proper assignment of this bond as sole security, a sum equal to (or less, at the option of the second party) the optional settlement amounts then payable under Paragraph 6 of this Bond. It being understood that the interest on the loan on this bond shall be 6% per annum. * * *

"9. Paid Up Bond. After this Bond has been in force for any of the periods shown in the following schedule, exclusive of any period or periods of default, the second party shall for such period, upon written request, and surrender of this bond, or if payments have been continuously in default for two years, at the option of the Company, may receive a Paid Up Bond due at the then maturity date of this Bond, in the amount based on each $3.75 monthly payment according to the following schedule: * * *

"10. Advance Payments. Advance payments in excess of the current year's requirements shall increase the loan or surrender value of this Bond as shown in paragraph Six hereof, by the amount of such excess plus interest at four per cent per annum compounded annually. By making advance payments this Bond may be cashed at any time for the full face value at the option of the registered owner hereof, or exchanged for a ten year Coupon Bond with interest at 5½% from date of said bond, payable semi-annually, when the unused advance payments with interest at four per cent per annum together with the present worth of the maturity value of this Bond computed on the basis of 6%

per annum compounded annually, less the present worth of payments yet to be made, computed on the same basis, shall equal the maturity value of this Bond. It being understood the total payments on this Bond shall not exceed Six Hundred Seventy-five Dollars per One Thousand Dollars. *. * *

"12. Cash in Full Guaranteed at Maturity. Anything in this Bond to the contrary notwithstanding, the second party shall at the time of maturity and upon surrender of this Bond, be entitled to receive, and the Company guarantees then to pay in cash the face amount hereof less any indebtedness due the Company. * * *

"There is no obligation and no liability either on the part of the owner of this Bond or on the part of the Company to pay any sums hereunder except those expressly specified.

"For the purpose of determining the sufficiency of the Company's assets to carry out its obligations as well as for ascertaining the amount of securities to be maintained, the loan or surrender value for each year shall be taken as the true value to the owner and as the measure of the Company's liability on this Bond in each such year. * * *"

It must be conceded that so long as the company was not guilty of a breach of its bond contract, its liability was measured by the surrender value after a sufficient amount had been paid to create a surrender value. But here the company was guilty of an anticipatory breach and it is clearly liable to all bondholders not in default for the damages they have sustained.

It also must be conceded that the statute, the resolution authorizing the permit, and the provisions of the bonds employ the cash surrender value or normal liability of the company as a yardstick to measure the amount of the deposit requirement. It was an appropriate yardstock because it was the basis on which the company would normally discharge its obligations to its bondholders. But an unusual situation has arisen. A liability for damages for breach exists.

■ We are of the opinion that the reference in the statute, the resolution authorizing the permit, and the bonds themselves, to liabilities of the company and to cash surrender values in connection with the deposit, was solely for the purpose of measuring the amount of the deposit and not

for the purpose of defining or fixing the obligation it should secure; and that the deposit was required and made to secure the performance of the bonds generally and any obligation that might arise thereon.

Any doubt as to this question seems to us to be set at rest by the provision of the statute requiring an initial deposit of $50,-000, before a permit should be issued for the sale of such bonds.

Suppose a company had made the initial deposit, secured its permit and commenced the sale of bonds, and before sufficient payments had been made to create a surrender value on any of the bonds, the company had committed anticipatory breaches of all its bond contracts; could it be said under those circumstances the bondholders could not resort to the deposit to satisfy their claims, because, through no fault of theirs, a surrender value had not been created? We think not.

We conclude the deposit should be applied pro rata on the claims of all the bondholders in classes one and two.

The claim of each person in class one should be allowed on the basis of the amounts paid to the company on his bond, or the surrender value thereof, whichever is greater, with interest to June 15, 1933.

The claim of each one in class two should be allowed for the amount paid to the company on his bond, with interest to June 15, 1933, less interest for the period he failed to make his installment payments.

The orders appealed from will be modified in accordance with this opinion and as so modified affirmed.