LAMAR et al. v. HILDRETH et al.
(No. 1448.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 8, 1919. On Motion for Rehearing, Feb. 19, 1919.)

1. CONTRACTS ⚖=329—BREACH—ACCRUAL OF CAUSE OF ACTION.

Upon breach of contract, injured party's cause of action at once accrues.

2. LANDLORD AND TENANT ⚖=331(2) — BREACH OF RENTAL CONTRACT—RECOVERY OF PROFITS.

Recovery can be had for landlord's breach of rental contract, in effect making undertaking a joint enterprise, for profits that would have been derived by tenants from crops had contract been continued to end of term.

3. CONTINUANCE ⚖=6, 7— ACTION BY TENANTS—DENIAL.

In cross-action by tenants against landlords to recover damages, application for continuance, not statutory, but addressed to discretion of trial court, on ground that continuance would render it certain what crop had been grown or could have been grown, and its value, held properly denied.

4. DAMAGES ⚖=62(4)—LANDLORD AND TENANT ⚖=103(3)—RENTAL CONTRACT—WRONGFUL RESCISSION—RIGHT OF TENANTS—REPLEVY BOND.

Where landlords repudiated rental contract by suing for and sequestrating land, tenants could accept renunciation, and agree contract should be put to an end, subject to their right to bring action for wrongful rescission, and their failure to make replevy bond and retain property during contract year did not affect their cause of action.

5. DAMAGES ⚖=163(2) — BREACH OF RENTAL CONTRACT—SEQUESTRATION OF LAND—NEGLIGENCE IN NOT REPLEVYING — BURDEN OF PROOF.

In action by tenants against landlords for breach of rental contract, if there was any reason why tenants' failure to replevy land after sequestration by landlords was negligence on part of tenants burden was on landlords so to allege and show.

6. LANDLORD AND TENANT ⚖=331(6)—BREACH OF RENTAL CONTRACT—EVIDENCE.

In action by tenants against landlords for breach of rental contract, evidence as to damages held not so vague, uncertain, and conjectural that no verdict for tenants could rightfully be based upon it.

7. LANDLORD AND TENANT ⚖=331(2)—BREACH OF RENTAL CONTRACT—LOSS OF PROFITS.

Where landlords broke rental contract, they were liable for profits, in contemplation of themselves and tenants, lost to tenants by their breach, so far as such profits could properly be proved to form measure of damages.

8. LANDLORD AND TENANT ⚖=323, 331(2) — TENANCY CONTRACTS—STATUS AS BUSINESS ENTERPRISE.

It is settled law in tenancy contracts upon shares to treat parties as having entered into joint business enterprise, stipulating what shall be advantage of each, and when one deprives other of such advantage he should be required to compensate him for what contract stipulated he should have.

9. DAMAGES ⚖=62(4)—CONTRACTS—BREACH—MITIGATION.

In action for breach of contract against one who wrongfully put an end to agreement, action being brought immediately for compensation and damages, injured party will be entitled to such damages as would have been received from nonperformance at appointed time, subject to abatement by any means he may have for mitigating his loss.

10. LANDLORD AND TENANT ⚖=322—RENTING ON SHARES—"SUBLETTING."

Where tenant on shares, in prospect of being drafted into the army, arranged with his brother to look after the land in his absence, such arrangement did not constitute a "subletting."

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Subletting.]

11. LANDLORD AND TENANT ⚖=331(8)—TENANCY CONTRACT — ACTION — DIRECTED VERDICT.

In action by tenant on shares against landlords for wrongful eviction and breach of contract, plaintiff alleging special damages by eviction as well as exemplary damages, court properly refused to direct verdict against plaintiff because he was a single man within draft age, and had been called to army, which would have interfered with cultivation of crop in any event.

12. LANDLORD AND TENANT ⚖=331(2) — BREACH OF TENANCY CONTRACT—DAMAGES.

For breach of rental contract tenant may recover what he would reasonably have made out of his crop but for breach, but is not limited to such item, and is entitled as well to loss sustained as well as gains prevented, and may recover for damages to his feed by the eviction.

13. LANDLORD AND TENANT ⚖=171(1) — BREACH OF CONTRACT—EJECTION BY LANDLORDS—REMOVAL BY TENANTS.

Where landlords sued out writ of sequestration against tenants, mere fact that sheriff did not resort to physical force in ejecting them, but permitted them to effect removal themselves, made it none the less an ejection by the landlords.

⚖=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

14. LANDLORD AND TENANT ⊂180(4)—RENT-AL CONTRACT—EVICTION—UNLAWFUL SE-QUESTRATION—EXEMPLARY DAMAGES.

Ordinarily exemplary damages are not allowed for mere breach of contract, as a tenancy contract, but where landlord wrongfully and willfully or maliciously uses writ of sequestration to obtain possession of rented property, to which he has no lawful right, such damages may be recovered.

15. LANDLORD AND TENANT ⊂180(3)—AC-TION FOR WRONGFUL EVICTION—EVIDENCE.

In action by tenants against landlords for damages from unlawful eviction, testimony of wife of tenant that landlords' cattle would come up to patch of feed about barn, and she would drive them off, held admissible to show animus of landlords in instituting proceedings against tenants out of which suit grew.

On Motion for Rehearing.

16. JUDGMENT ⊂252(1)—EXCESS OVER AMOUNT PLEADED.

Where defendants, by cross-petition, alleged two items of actual damages, one for $1,000, and other for $100, judgment for $1,010, was not erroneous, simply because prayer left out $100 item.

17. EVIDENCE ⊂52—JUDICIAL KNOWLEDGE —APPLICATION ON APPEAL.

Court of Civil Appeals cannot base reversal of judgment for tenants who, in their landlords' action of trespass to try title, have recovered for breach of rental contract by eviction, on its judicial knowledge that particular season was dry, and that no crops were made in that part of country.

Appeal from District Court, Cottle County; J. H. Milam, Judge.

Action by Susie Lamar and H. L. Lamar, her husband, against J. H. Hildreth and another. From judgment for defendants, plaintiffs appeal. Affirmed.

J. M. Whatley, of Paducah, and Fires & Diggs, of Childress, for appellants.

J. M. Hawkins, of Hempstead, for appellees.

HUFF, C. J. Susie Lamar and her husband, H. L. Lamar, brought an action of trespass to try title against J. H. Hildreth and B. H. Bates to recover two certain tracts of land in Cottle county, and at the same time sued out a writ of sequestration, in the affidavit for which they stated that they were entitled to the possession of the premises, and that they feared that the defendants, then in possession, would make use of such possession to injure the property, etc. The defendants, Hildreth and Bates, answered by general denial, and by way of cross-petition that they had not and did not then assert any claim to the freehold in the land described in plaintiffs' petition, but that

on or about the last of June or the first of July, 1917, plaintiffs and defendants entered into a valid and binding oral contract or agreement, wherein, for the consideration thereafter mentioned, defendants leased from plaintiffs, for the year 1918, all of the lands described in the petition, consisting of approximately 330 acres of land, and were at the time of the filing of the suit, and are now, entitled to the possession until the expiration of their lease, on the 31st day of December, 1918. They allege that there were 175 acres thereof in cultivation, and the remainder in pasture, and that upon the premises there were two houses which the defendants were to have during the contract. The defendants allege that they obligated and bound themselves to, and would have and are now ready and able to, cultivate all of said 175 acres of land in a good and farmer-like manner, as follows: 125 acres in cotton and 50 acres in corn, agreeing to pay to plaintiffs as the rental thereof the sum of one-fourth of all the cotton raised and one-third of all the feed raised on said premises, and that but for the acts and conduct of the plaintiffs they would have reasonably raised upon said land 30 bales of cotton and 50 tons of feed; that on the 8th day of January, 1918, the plaintiffs breached their contract, and instituted this suit, alleging that they were afraid the defendants would injure said property, and convert the fruits and revenues to their own use and benefit, and executed a bond in the sum of $23,600 for the willful and malicious purpose of evicting defendants from the premises without a hearing, and in willful defiance of their lawful rights, and for the sole purpose of injuring and harassing defendants, and in pursuance of said bond, and in conformity of the law, the clerk of the court issued a writ of sequestration, and placed same in the hands of the sheriff, which instructed him to dispossess defendants, which the sheriff did, by virtue thereof, on or about the 10th day of January, A. D. 1918, during the coldest weather of the year, leaving defendants without a place to go or shelter for themselves or stock; that at the time of the ejection the defendants had about 15 head of stock and about $500 worth of feed; that their feed had to be stacked in the open at great loss and waste; that they had no place to keep their stock, and were compelled to tend and feed them, to their damage in the sum of $100; that by reason of the unlawful ejectment of defendants they were prevented from using and cultivating the land described in plaintiffs' petition during the year 1918, and were deprived of a home for themselves and a pasture for their stock, all of which they have not yet been able to secure, to their damage in

the further sum of $1,000. "Defendants would represent to the court that but for the acts and conduct of plaintiffs they would have, in all reasonable probability, raised on said land during the year 1918 30 bales of cotton, three-fourths of which would belong to them; that they would have raised 50 tons of feed, two-thirds of which would have belonged to them; that the market value of said cotton so raised upon said premises would reasonably be worth $100 per bale; that the reasonable market value of the feed that would have been raised upon said premises would be $40 per ton, which would have netted your defendants, after deducting all the expense of planting, cultivating, and gathering the same, $2,000." They allege that since the breach of the contract on the part of the plaintiffs they have made every effort to procure other lands, pasture, and houses to take the place of the land, pasture, and houses that they had rented from the plaintiffs for the year 1918, but without avail. They allege that they had secured 115 acres of sod land upon which one of the defendants was then living, and of a very inferior grade, and inferior to the land rented from the plaintiffs, which would require much more work and produce less by one-half, acre for acre, than the land rented from plaintiffs; that by the exercise of ordinary diligence in cultivating this land it would be impossible for defendants to produce more than $1,000 worth of cotton and feedstuff, after deducting the cost and expense of breaking, cultivating, gathering, etc. They further plead that, by reason of the unlawful act and conduct of the plaintiffs in willfully and maliciously ejecting them from the premises herein mentioned, they have suffered mental and physical anxiety and humiliation to their further damage in the sum of $2,000. The jury found upon special issues submitted to them that the plaintiffs entered into an unconditional rental contract with the defendants for the year 1918; that the defendants' feed was damaged to the amount of $10 by reason of the ejection of the defendants from the premises; and that the defendants were damaged in the sum of $1,000 by reason of their failure to occupy and cultivate the premises of plaintiffs from which they were ejected, and that they were damaged in the sum of $500 by reason of the willful ejection from the premises and in the willful disregard of the defendants' rights by the plaintiffs. The evidence will support a finding by the trial court that the plaintiffs and defendants entered into a rental contract on the terms pleaded by the defendants in their cross-petition.

[1-3] The first assignment asserts error on the part of the trial court in overruling the appellants' motion for continuance. The motion set up, in effect, that the time for the expiration of the rental contract had not then expired. The application was made May 1, 1918. That the year previous had been a dry one, in which poor crops were made, and that it was then dry and to such an extent that no crops had been planted up to that date, and if the case should be continued until October, 1918, it could then certainly be known what crop had been grown or could have been and its value.

It must be borne in mind that this is not an action for the crops grown on the premises under a rental contract, but is a suit for damages for the breach of a rental contract on shares. It is a rule, now well established and recognized, that upon the breach of a contract the injured party's cause of action at once accrues. Greenwall v. Markowitz, 97 Tex. 479, 79 S. W. 1069, 65 L. R. A. 302; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Hearne v. Garrett, 49 Tex. 619. The only question in our mind presented by the motion is whether damages could be assessed for the period of time subsequent to the trial and within the contract period. This, however, would not be grounds for postponement on the part of the appellants. Rental contracts upon shares have a double aspect—one is that of employment by the tenant, and the other is the profits to be derived by the undertaking. In this state it appears to be the rule, where a party sues for the breach of a contract for personal services for a given period, that he will be confined to his damages which have accrued up to the trial. Litchenstein v. Brooks, 75 Tex. 196, 12 S. W. 975; Louisiana Rio Grande Canal Co. v. Quinn, 161 S. W. 375; and other Court of Civil Appeals' cases. On this question, however, there is a conflict of authority by other courts, as in Michigan, Massachusetts, and some other states. See Webb v. De Pew, 152 Mich. 698, 116 N. W. 560, 16 L. R. A. (N. S.) 813, 125 Am. St. Rep. 431. But we believe the rule will not apply where profits are to be derived from a rental contract, which, in effect, makes the undertaking a joint enterprise. A recovery can be had for the breach for the profits that would have been derived from the crops had the contract been continued to the end of the time. Greenwall v. Markowitz, supra, and other cases, which will be later cited. At any rate, we are unwilling to extend the rule as applied to personal service contracts to cases like the present one. We mention this matter at this place, as it is suggested to our mind in the consideration of the motion, and is possibly involved in considering the question of damages, but which is not assigned in terms as lessening the recovery. The application for continuance is not statutory, but was addressed to the discretion of the trial court. Appellants do not show themselves equitably entitled to the continuance. The motion, for the purpose of the con-

tinuance, assumed a wrongful breach of the contract. The liability for damages which appellants inflicted by breaking their contracts as assessed for the term of the contract is one which they must be taken to have understood when they wrongfully ejected the appellees. If they did not wish to be subjected to such damages, they should have kept the agreement.

[4, 5] The second assignment asserts that the court was in error in overruling the appellants' general exception to the appellees' cross-petition, because there is no allegation that appellees were unable to make a replevy bond and thereby retain the property during the contract year. It is asserted that the appellees, though injured by the wrongful act of appellants, were under the duty to use all reasonable means to avoid any damage by reason thereof. The proposition may be true as a general rule, but it does not follow because one does not, when he can, make a replevy bond, that he is per se guilty of negligence which would defeat damages occasioned by the wrongful act. At most, it could be no more than a circumstance to be considered with other facts. The law does not impose upon a defendant the duty of making a replevy bond; it only permits him to do so. If there was any reason why a failure to make such replevy would be negligence on the part of defendants, we think that burden was on appellants to allege and show. Our Supreme Court held in Porter v. Burkett, 65 Tex. 383:

"As to the special exceptions, it was not necessary to allege that the plaintiffs could not have saved themselves from the consequences of the default of defendants by obtaining work elsewhere. If it were shown on the trial that they could, by this means, have reduced their losses or saved themselves harmless, it would have been a good defense, in whole or in part, to the action. A plaintiff is not bound to negative everything that might defeat his action. If the damages he shows he has incurred are to be reduced from any cause not necessarily occurring, in all such cases this must be shown by the opposite party in defense."

This rule has been followed in a number of cases as well as under a variety of circumstances. San Antonio Life Insurance Co. v. Griffith, 185 S. W. 335, where will be found a list of authorities; see, also, Miller v. Sealy, etc., 166 S. W. 1182. But, aside from the above, if there was a rental contract, as alleged, appellants repudiated it by suing for and sequestrating the land. The appellees could accept this renunciation, and agree that the contract should be put to an end, subject to the retention by them of their right to bring an action for the wrongful rescission. It was an option with appellees whether they accepted the renunciation and sue for their damages occasioned by the breach, or retain the land and enforce the contract as made. If they had replevied they

could have retained possession of the land, with the right of occupancy and cultivation thereof under the contract, subject to the final determination of the contract by the court; but they were not bound to this course. Appellants, having wrongfully ejected the appellees, cannot insist on defeating damages resulting therefrom on the ground that appellees should enforce the contract instead, as they did, accepting the breach and suing for damages. The case of Taylor v. Kelley, 189 S. W. 340, cited by appellants, has no application to this suit. In that case the owner of an automobile sued to recover the car, or for its value, which had been seized under process for the debt of another. He sought to recover also for the loss of the hire or use in business while it was so detained. The court said there was no showing why he had not replevied the car or purchased another. That case is different in its facts and principles from this, and it will be unnecessary to discuss it further. We think there was no error in overruling the general exception.

We will consider the third, sixth, seventh, and tenth assignments together. These assignments relate to the refusal by the trial court to instruct a verdict for appellants and in submitting the issue to the jury to determine if the appellees were damaged, and the amount, on the ground that there was no evidence authorizing a recovery. Under these assignments it is asserted by propositions: (1) A recovery could not be had because no replevy bond was made by appellees; (2) the evidence is vague, uncertain, and conjectural as to what the damages might be, and no verdict could rightfully be based thereon; (3) the evidence having failed to show appellees would be damaged at all by ejectment from the premises, there was nothing to authorize a judgment for any amount, and should not have been submitted, and a verdict for $1,000 shows prejudice; (4) in the absence of any evidence as to what damages the defendants sustained, it was reversible error for the court to instruct that the measure of their damages was what defendants in "reasonable probability" might have earned but for their ejection.

The evidence shows the land rented had in cultivation 175 acres; that appellees would have placed of it 125 acres in cotton and 50 acres in feed; that in an average or ordinary year one-third of a bale of cotton could be, and usually is, produced, or a total of 40 bales on 125 acres, the value of which was 20 or 25 cents per pound at the time of the breach, and one ton of feed to the acre, of the value of $40 per ton; that appellees would have received three-fourths of cotton and two-thirds of the feed, or gross about $4,400 to appellees' part. The appellee Hildreth testified that they would have made not, after paying all costs and expenses of

cultivating, gathering, and marketing, $2,000. If the crops would have made as much per acre as claimed, it is evident the value was not overestimated; the cotton seed and other items show not to have been taken into consideration in estimating the value. After appellees were ejected from the premises they had to hunt land, houses, and pasture for themselves and stock. The evidence indicates they placed the stock in different pastures, and shows they were only able to get 115 acres of land, which had been sodded in the year previous, but the crop that year was hailed out, and the land was not cultivated; that it was for that reason sod land and not grubbed; that this land would not produce as much by half, acre per acre, as the land rented from the appellants. The jury evidently credited the profits they would have made on the rented land with $1,000, which would have been produced from other land rented after the ejection. The appellees had the work stock and tools to work and cultivate the land and care for it, and show that they could and would have worked it. The evidence shows there was a drought the year before, and that it was then dry at the time of the trial.

[6-9] We have expressed our views relative to requiring the appellees to make a replevy bond under the second assignment of error, and it is needless to discuss that question further. In this character of case it is not required to establish each item with mathematical certainty. The facts surrounding the contract and parties should be given to the jury, and they are allowed much discretionary power in arriving at a verdict; it is largely left to their judgment on the evidence before them. This is frequently illustrated in cattle shipping cases, personal injuries, and the like. A person who violates his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain. It is not true that loss of profits cannot be allowed as damages for a breach of contract. Losses sustained and gains prevented are proper elements of damages. Most contracts are entered into with the view of future profits, and such profits are in contemplation of the parties, and, so far as they can be properly proved, they may form the measure of damages. As they are prospective, they must, to some extent, be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy. It is usually his right to prove the nature of his contract, the circumstances surrounding and flowing from its breach, and the consequences plainly traceable to it, and then it is for the jury, under proper instructions as to the rules of damages, to determine the compensation to be awarded for the breach. The earnings or profits are undoubtedly in their nature contingent and speculative and difficult of estimation, but being made, by the express agreement of the parties, the essence of the contract, we do not see how they can be excluded in ascertaining the compensation to which appellees are entitled. In this state it is now the settled law in tenancy contracts upon shares to treat the parties to the contract as having entered into a joint business enterprise, stipulating what shall be the advantage of each. When one deprives the other of those advantages, he should be required to compensate him for that which the contract stipulated he should have. In the cases decided the general rule is given for ascertaining the value of such shares. In this case the trial court gave the rule for ascertaining the net value of the appellees' share which would, in reasonable probability, have been made upon the rented premises. The discussion of this relation and the rules governing contracts of this character are clearly stated in Brincefield v. Allen, 25 Tex. Civ. App. 258, 60 S. W. 1010, which has been expressly approved by the Supreme Court in Rogers v. McGuffey, 96 Tex. 565, 74 S. W. 753; Crews v. Cortez, 102 Tex. 111, 113 S. W. 523, 38 L. R. A. (N. S.), 713; and followed by the Courts of Civil Appeals in several cases. Waggoner v. Moore, 45 Tex. Civ. App. 308, 10 S. W. 1058; King v. Griffin, 39 Tex. Civ. App. 497, 87 S W. 844; Springer v. Riley, 136 S. W. 577.

There is no complaint in this case to the charge of the court in instructing the jury and in giving the measure of damages. The charge appears to have been applicable to the facts and circumstances of this case. Appellants appear to be under the impression that because the season for crops had not started, or was not then over, that the contingency of such crops rendered the testimony of the reasonable probability under ordinary or average years too uncertain and speculative to base a finding of damages. One who has wrongfully put an end to a contract into which he has entered cannot justly complain if he is immediately sued for compensation in damages by him who he has injured. In such action the injured party will be entitled to such damages as would have arisen from nonperformance at the appointed time, subject to abatement by any means he may have had for mitigating his loss. Even if the injured party "actually obtains his profits before the time fixed for performance, and recovers on a basis of costs which might have been increased or diminished by subsequent events, the party who broke the contract before the time for completing performance cannot complain, for he took the risk involved in such anticipation." Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953.

[10, 11] The fourth assignment is based on the refusal of the court to give a requested charge, directing a verdict against Hildreth, for the reason that for the year 1918 he

was undertaking to grow a crop separate from Bates; that he is a single man, within the draft age, and has been called to the army, and will leave for service May 6, 1918, and unable to make a crop, and forced to leave the land and crop without making any arrangements for their cultivation and harvesting, and, even if he had made arrangements, it was not shown whether or not the expense that would be incurred by him in having said crop cultivated and harvested would not be more than the value of the crops to be grown and harvested. This assignment is not followed by propositions, and is submitted as a proposition itself. We are at a loss to know what particular ground appellants rely on for instructing a verdict. In their argument they apparently considered the arrangements made by Hildreth with his brother to look after the land as a subtenancy. Clearly this arrangement was not a subletting. Hildreth testified he received his questionnaires in the summer of 1917, and that he was placed in class 1, and was examined and accepted, and notified he was subject to call upon 24 hours' notice; that had he retained appellants' land the conditions would have been the same. He procured or rather one of his brothers agreed to look after the land for him, and another agreed to work it for him in his place. He and Bates were renting the appellants' land together, and Bates was to have looked after their joint interest, or, as they express it, would have been overseer. The statement that he has not shown that the expenses would not be more than the value of the crop is a different proposition from the first part of the assignment. This part of the assignment asserts a distinct proposition from the one asserting that no arrangement was made, and no such proposition is presented thereunder as to require us to discuss the evidence on this po'nt. However, we think the charge requested was properly refused, because the appellees allege special damages by being evicted from the premises, as well as exemplary damages, both of which the jury found they were entitled to, and Hildreth certainly had the right to recover the damages he had already sustained, and the court would not have been justified in instructing a verdict against him.

[12] The fifth assignment is founded upon an objection to the second issue submitted by the court to the jury, which inquired of the jury if the feed on the place belonging to defendants was damaged by reason of the defendants being ejected from the premises. The proposition under this assignment is that the measure of damages for breach of a rental contract is what the tenant would reasonably have made out of the crop but for such breach. The courts of this state have held the tenant may recover such profits, but they have not held that this is the only item which he can recover. He is enti-

tled as well to the "loss sustained" as "gains prevented." In other words, he is entitled to compensation occasioned by the breach. "If any special damage is pleaded, which is shown to have been in reasonable contemplation of the parties at the time the contract was entered into as a probable result of its breach, the special damages so shown can be recovered in addition to the damages which would ordinarily result from the breach of the contract." Ry. Co. v. Jackson, 29 Tex. Civ. App. 342, 69 S. W. 89.

[13, 14] The eighth and ninth assignments relate to issue No. 4, submitting to the jury the issue of exemplary damages. The proposition is that there is no evidence that appellees were ejected from the premises, but it is shown that they moved off without being put off by the plaintiff or the sheriff, and the issue suggested to the jury that they might find exemplary damages was error. The appellants sued out the writ of sequestration, stating they were entitled to the possession of the land. Bates testified substantially that the sheriff came out to the place with a writ in January, during very cold weather; that the sheriff told him he had authority to dispossess them, but said, " 'We will give you the privilege of moving your own stuff;' and we told him if he would give us until tomorrow we would move out, and he came back." He testified further: "When the sheriff came out there and notified us that he had those papers we told him we would get out. He told us we could get out ourselves if we wanted to. We got off the place without the sheriff putting us off." It is manifest the appellees did not voluntarily leave the place, but that they moved under the compulsion of the writ with which appellants had armed the sheriff. The mere fact that the sheriff did not resort to physical force in ejecting the appellees made it none the less an ejection by appellants. Clark v. Pearce, 80 Tex. 146, 15 S. W. 787. Ordinarily exemplary damages are not allowed for a mere breach of contract, but where a plaintiff wrongfully and willfully or maliciously uses a writ of sequestration for the purpose of obtaining possession of property to which he has no lawful right such damages may be recovered. Simpson v. Lee, 34 S. W. 1053; Land v. Klein, 21 Tex. Civ. App. 3, 50 S. W. 638; Knox v. McElroy, 103 Tex. 357, 127 S. W. 798; Waggoner v. Wyatt, 43 Tex. Civ. App. 75, 94 S. W. 1076; Gross v. Hays, 73 Tex. 515, 11 S. W. 523; McKee v. Garner, 168 S. W. 1031.

The eleventh assignment presents objections to the testimony of J. H. Hildreth, as to what he in reasonable probability would have made in anything like an ordinary year, etc. Most of this if not all of the evidence was admissible under the rules for damages heretofore announced. The objections made go more to the weight of the testimony than to its admissibility.

[15] The twelfth and thirteenth assignments complain of the admission of the following testimony by Mrs. Bates:

"I do recall the occasion when Mr. Lamar turned some of his cattle in on us—about 125 head. These cattle would come up around the house, around the barn—come in to a little patch there. I would go over there and drive them back off a little patch to feed, a voluntary oats, that would be beneficial to our stock. We really needed it, and that was all I ever done to his stock at all. I drove them back off of that patch of feed. Mr. Lamar came to me one day—came over there hollowing at me and told me to stop it. He said if I didn't he would cause me trouble; and I says, 'I am going to put them out;' and he says, 'I am going to put you off.' He says, 'I don't want no such people on my place.' * * * He says, 'I will put you off.' I told him, 'Well, to do it, and then talk about it.' He says: 'I will do it; when I set my head to do anything I come very near doing it. I will put you off if it costs everything Mrs. Lamar has got.' That conversation took place there on our place, and I rode up the road and he followed me. * * * It was only a short time after that we got the notice to get off, and it was only a short time after Mr. Lamar made that remark until I was arrested, and I have a case pending against me in the county court here now. After this notice was served upon us we were put out, and were not able to procure a house. The house we are living in now is just a little shack covered with sheet iron, and we have a tent to cook and eat in. Not a drop of water on the place of any kind. The fact that he put me off under the process of the court certainly did cause me worry; I worried. I could not say how much I have worried and have been bothered about it. It has been the worst worry I have ever had."

The appellant H. L. Lamar testified that he turned his cattle in the stock fields because he thought he had the right; that it was some time during the middle of November that Mrs. Bates drove the cattle out of the field, and it was just a few days before he filed complaint against her, but that he was going to file it anyway if that had not happened; that he put in the complaint that they had been running the cattle off their accustomed range, and "they had been running them there every day from one to five times." He shows also by his testimony that he sued out the complaint against Mrs. Bates a few days before he gave the notice to the appellees to quit the premises. He had also testified when first on the witness stand, admitting that when Mrs. Bates was driving the cattle out of the field that it made him mad, and that he then went to town and filed the complaint. We think on the issues in this case the testimony of Mrs. Bates was admissible.

The fourteenth and fifteenth assignments urge error in admitting the evidence of W. M. Glasscock and W. A. Walling; their testimony being, in effect, as to what the land would produce in ordinary or average years. The objection made at the time appears to be that the testimony was uncertain, etc. What we have heretofore said disposes of these assignments.

The sixteenth assignment is to the jury's finding that the rental contract was an unconditional one because, it is asserted, that it is unsupported by the evidence. If the appellees' testimony is true, it supports the jury's finding.

The seventeenth, eighteenth, nineteenth, twentieth, and twenty-first assignments are overruled for the reasons heretofore given in this opinion. These assignments seek to raise in different form the questions presented in the assignments heretofore discussed.

We find no reversible error assigned and briefed, and the judgment will therefore be affirmed.

### On Motion for Rehearing.

[16, 17] It is insisted that there was fundamental error in not sustaining the twentieth assignment, which is to the effect that the cross-petition only sought a recovery for $1,000 actual damages, while the verdict is for $1,010. This is based on the prayer for $1,000 actual damages and $2,000 exemplary damages, and for general and equitable relief to which in law appellants may be entitled. It may be said that we overlooked the prayer in the original opinion, as the body of the petition set out two items of actual damages, one for $1,000 and the other for $100. It is evident by the petition appellee sought a recovery for both items. We do not think it fundamental error to recover an amount sued for simply because the prayer left out one item. This would not limit the cause of action to the amount stated in the prayer. The prayer would authorize the recovery of the amount stated in the body of the petition where it should be stated. Ry. Co. v. Canyon, 102 Tex. 478, 119 S. W. 294. As to the testimony of Mrs. Bates, of which complaint was set out in the fourteenth assignment, we will state that under the assignment in the brief there was included much testimony admissible under the allegations for exemplary damages; but if the bill in the record properly segregated the evidence in regard to the effect the acts of appellant had upon Mrs. Bates' feelings, etc., we see no just ground upon which we could base a reversal. The admission of appellant and the uncontradicted facts show that appellants not only threatened to put Mrs. Bates and her family off the premises, and to have her arrested, but it also shows that he did immediately follow up his threat by sequestrating the property, and by having Mrs. Bates arrested for driving his cattle off their accustomed range; that is, off of the standing feed in the field of the appellees. These facts, we think, were admissible to show the animus

of appellant in instituting the proceedings out of which this suit grew. A jury of ordinary intelligence would understand that such acts would humiliate and trouble any one. The mere fact that she stated it did would not add any force to the uncontradicted facts as to what was actually done, and it is not at all likely or probable that any injury resulted from her mere statement that it did worry her or affect her feelings. It may be we should take judicial notice that it was dry, and that no crops were made in that part of the country in 1918; but we know of no rule that would authorize us to base a reversal upon our knowledge, or to set aside the verdict of the jury based on evidence. When appellant breached the contract he took the risk of a recovery at that time. In the light of subsequent events he may have conferred a favor on appellees, but cases cannot be reversed upon such contingencies. We can only look to the evidence, and, if we believe the court and the jury had evidence sufficient to sustain the verdict, it is our duty, as we understand it, not to set their verdict or judgment aside.

The motion will be overruled.