## ROCKHILL IRON & COAL CO. v. CITY OF TAUNTON.

(Circuit Court of Appeals, First Circuit. May 12, 1921.)

No. 1458.

1. **Municipal corporations ⚖══232—In the absence of regulations, manager of electric plant can contract for coal to be delivered after his term expires.**

   Under St. Mass. 1905, c. 410, § 3, authorizing the mayor to appoint a manager of municipal lighting, to have, under the direction of the mayor, full charge of the plant and of the purchase of supplies, a manager appointed by the mayor for a fixed term can, in the absence of regulations by the mayor to the contrary, make a contract for the purchase of coal needed by the plant for a period extending beyond the manager's term, and such contract is binding on the city after the expiration of such term.

2. **Sales ⚖══381—Burden is on defendant to prove damages could have been minimized.**

   In an action for breach of contract for the purchase of a particular kind of coal, where the plaintiff claimed the right to recover the difference between the contract price and the cost of production, on the theory that the coal was to be specially mined to fill the contract, the burden was on defendant to prove that such damages could have been prevented, by proving that plaintiff had the coal ready for delivery, and that the difference between the market price of such coal at the time and place of delivery and the contract price would have been less than the damages claimed by plaintiff, if such were the facts.

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Sales** ☞384(6)—**Measure for breach of contract to sell coal not mined is difference between contract price and cost of production.**

 The measure of damages for the breach of a contract for the purchase of a particular kind of coal, which was not yet mined by the seller, is the difference between the contract price and the cost of producing the coal, and of delivering it at the place of delivery.

4. **Damages** ☞12—**Only nominal damages can be recovered for breach of contract, if evidence does not establish substantial damages.**

 In an action for breach of contract, only nominal damages can be recovered, if there is no evidence produced from which the facts necessary to determine the damages under the proper rule can be determined.

5. **Sales** ☞383—**Evidence held not to show cost of coal at place of delivery.**

 In an action for breach of a contract for the purchase of coal to be delivered by the seller, a table of cost of producing coal and of its selling price at the mine is insufficient to sustain a judgment for substantial damages, if the table referred to coal of a kind different from that specified in the contract, or even if it referred to the same kind of coal, since it cannot be assumed that the profit on the sales at the mine was the same as the profit on the sales under the contract, which would be necessary to establish the difference between the mine price and contract price as the cost of delivery.

 Anderson, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Action by the Rockhill Iron & Coal Company against the City of Taunton. Judgment for defendant (261 Fed. 234), and plaintiff brings error. Reversed and remanded.

Asa P. French, of Boston, Mass., for plaintiff in error.

Harvey H. Pratt, of Boston, Mass. (Albert Fuller, of Taunton, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is an action brought by the Rockhill Iron & Coal Company, a Pennsylvania corporation, against the city of Taunton, a Massachusetts municipal corporation, for breach of contract.

The plaintiff's business consists in mining coal in Pennsylvania and shipping it to purchasers in the different states. The defendant corporation was authorized (Acts of Massachusetts 1905, c. 410, § 3) to maintain and operate a plant for manufacturing and distributing electricity for the benefit of its inhabitants. The provisions of the above act, so far as material to this case, read as follows:

 "Sec. 3. The mayor of a city * * * shall appoint a manager of municipal lighting who shall, under the direction and control of the mayor * * * have full charge of the operation and management of the plant, the manufacture and distribution of gas or electricity, the purchase of supplies, the employment of agents and servants, the method, time, price, quantity and quality of the supply, the collection of bills, and the keeping of accounts. His compensation and term of office shall be fixed in cities by the city council [or corresponding body]. * * * All bills chargeable to the plant or to the appropriations therefor shall be paid by the treasurer on requisition by the manager. * * *"

By ordinance the term of the manager was fixed at three years. On December 16, 1911, Michael Golden was appointed manager for an unexpired term ending June 30, 1914. June 17, 1913, he entered into a contract in behalf of the defendant with the plaintiff for the purchase of coal for the lighting plant, covering the balance of his term and a year and a half beyond it.

In the contract it was agreed that the plaintiff would supply and the defendant would buy all of the bituminous coal required by the lighting plant from the date of the contract to December 31, 1915. For the year 1913 the defendant was to take 4,000 tons more or less, and for each of the years 1914 and 1915, 5,000 tons more or less. All shipments were to be alongside wharf of the lighting plant and the price of the coal was to be $4.25 per gross ton alongside. Payments were to be made on the 15th day of each month for coal furnished the previous month, and the coal was to be of the brand known as "Rockhill" semibituminous smokeless coal and of the same quality previously furnished the lighting plant.

Under this contract 7,866 tons of coal were delivered from time to time down to and including August 7, 1914, and were paid for. Of this amount five shipments of 2,336 tons were received between July 1 and August 7, 1914.

On or about July 1, 1914, Leland D. Wood was appointed manager to succeed Golden, whose term had expired. August 7, 1914, Wood, having entered upon the performance of his duties, notified the plaintiff that the defendant refused to recognize as valid the contract of June 17, 1913, and declined to receive or pay for any further coal which might be tendered under the contract; whereupon, on the 19th of December, 1914, this action was brought.

During the period from August 7, 1914, to December 31, 1915, the defendant, through its manager, purchased from another dealer for use at its plant 9,895 tons of coal, which was the total amount purchased for consumption at the plant during the unexpired term of the contract. It further appeared what the coal thus purchased cost at the mines and what its selling or market price there was, and that the profit to the vendor on this basis of computation for the 9,895 tons was $5,641.43.

In the declaration the plaintiff set out the contract, alleged its breach by the defendant, and that it had been at all times ready and willing to perform.

The defendant in its answer set up three defenses: (1) It denied the authority of Golden to make a contract for the city beyond the period of his employment; (2) alleged that the plaintiff and Golden did not act in good faith in making the contract; and (3) that the contract was void for the reason that the plaintiff was not licensed to do business in Massachusetts. No evidence was adduced at the trial to support the second defense, and, as to the third, the court found and ruled against the defendant.

It was agreed that no regulations pertaining to the duties of the manager of the lighting plant had been prescribed by the mayor, and that none were in force during Golden's tenure of office.

The case was submitted to the court upon agreed facts and certain oral testimony, the latter of which is not reported, as it is not material to the questions presented.

The plaintiff requested the court to rule: (1) That, upon all the evidence, Golden, as manager, was authorized to execute, in behalf of the defendant, the contract declared upon; (2) that Wood's refusal, as manager, to receive or pay for the balance of the coal, constituted a breach by the defendant of the contract; (3) that, upon all the evidence, the measure of damages was the difference between the cost of production and the selling price at the mines of such coal as the defendant refused to receive and pay for in accordance with the terms of the agreement; and (4) that, upon all the evidence, the plaintiff was entitled to recover damages in the sum of $5,641.43, with interest from the date of the writ. These requests were refused, and the plaintiff excepted.

The court found and ruled: (1) That Golden had no authority to make the contract, unless it was conferred upon him by the statute under which the defendant operated its municipal lighting plant; (2) that it was not established that the contract sued upon was actually or impliedly authorized; (3) that the defendant rightfully terminated the contract on August 7, 1914, and is not liable for its refusal to accept subsequent deliveries thereunder; and (4) that the plaintiff, if entitled to recover, could recover only nominal damages. Judgment was entered for the defendant, and the plaintiff prosecutes this writ of error.

In Capron v. Taunton, 196 Mass. 41, 81 N. E. 873, section 3 of chapter 410 of the act of 1905, and the preceding acts of which it was an amendment, were under consideration. It was held that section 3 took away from the city council the right of supervision over the manager previously vested in that body and conferred it "solely upon the mayor"; that while the mayor, like the city council before it, was not required to prescribe regulations by which the manager's "statutory duties should be performed," he was empowered, if he thought it expedient, to prescribe "such general regulations concerning the exercise by him of his statutory powers as were found to be reasonably required, and as did not violate the statute."

After stating that, subsequent to the enactment of section 3, "no regulations whatever were established by the mayor under which the manager should perform his official functions," the court further held that the legislative purpose manifest throughout the act was "that original authority to contract in behalf of the city for the hiring of all employees, or to discharge them, was delegated only to the manager," and that, inasmuch as the plaintiff, an employee of the electric lighting plant, had been discharged by the manager, the discharge was lawful, "and, the mayor not being vested with any authority to re-employ him, he [had] no cause of action either for wages or damages against the city."

The mayor having appointed Golden manager of the city lighting plant, without establishing any regulations limiting his discretion in the performance of his duties, the first question is whether the manager was authorized to make the contract here in suit.

[1] By section 3 express authority was vested in Golden as manager to purchase coal. In the language of the act he was given "full charge * * * of the purchase of supplies," and, inasmuch as no regulations had been established by the mayor limiting his discretion and bad faith was not shown, the question reduces itself to whether, from the mere fact that the contract related to the purchase of a supply of coal for a year and a half beyond the period of his term of office, it can be said that he was acting without authority and that the contract was void.

In Blood et al. v. Manchester Electric Light Co. et al., 68 N. H. 340, 341, 39 Atl. 335, 336, the question before the court was whether a contract entered into by the city councils of Manchester with the Manchester Electric Light Company for lighting its streets was illegal and unauthorized for the reason that it was one for a term of ten years. In discussing this matter the court said:

"The city councils of Manchester were authorized to exercise the powers of the corporation, namely: 'All the powers vested by law in towns, or in the inhabitants thereof.' P. S. c. 50, § 1; Laws 1846, c. 384, § 14. This language excludes all ground for believing that the Legislature intended to limit the authority of the councils, so that they could not bind the corporation beyond the unexpired part of their term of office. The Legislature would not leave such intention to be inferred from language which conveys no suggestion of the limitation. The necessity for continuity in the operations of the government is a reason why there should be no such limitation. The agencies of the government change, but the government goes on without interruption. The authority of the city councils while in office being coextensive with the powers of the city or its inhabitants, the limitation in their term of office is immaterial in the decision of the question under consideration. The contract stands the same as if it had been made by a vote of the inhabitants acting under a town organization. * * *

"In making contracts, a town or city does not act in its legislative capacity, but in what is termed, for the sake of distinction, its private capacity. 1 Dill. Mun. Cor. §§ 27, 39. In this capacity it resembles an individual or private corporation, and its contracts have the same binding force upon it that the contracts of individuals and private corporations have upon them. Greenland v. Weeks, 49 N. H. 472, 480, et seq.; South Hampton v. Fowler, 52 N. H. 225, 231; Small v. Danville, 51 Me. 359, 361. * * * The city councils, in exercising the powers of the city, could determine the kind of lights to be used for lighting the streets, their location, when they should be lighted, and all other details of the business. They had power also to determine the length of time a contract for lighting should continue, in view of the necessity and convenience of the service required. If they, in good faith, exercised the discretion lodged with them, their contract is a legal contract, and will bind the city the same as a similar contract made by the directors of a private corporation binds it. Dibble v. New Haven, 56 Conn. 199; Putnam v. Grand Rapids, 58 Mich. 416, 419. If they should make a contract for a term of unreasonable duration, this circumstance would be evidence of want of good faith on their part."

To the same effect, see Illinois Trust & Savings Bank v. Arkansas City, 76 Fed. 271, 282, 283, 22 C. C. A. 171, 34 L. R. A. 518; Biddeford v. Yates, 104 Me. 506, 515, 72 Atl. 335, 15 Ann. Cas. 1091; Baily v. Philadelphia, 184 Pa. St. 594, 39 Atl. 837, 63 Am. St. Rep. 812; Manley v. Scott, 108 Minn. 142, 121 N. W. 628, 29 L. R. A. (N. S.) 652.

The authority of Golden while in office, so far as concerned the purchase of supplies for the lighting plant, was coextensive with the

powers of the city, and the limitation in the term of his office was immaterial. Under the authority vested in him by section 3 it was within his power to determine the kind and amount of coal he would buy and when it should be delivered; and the only limitation upon this power, in the absence of regulation by the mayor, was that he should exercise good faith in making the purchase. As he was authorized to buy the coal, and did not act in bad faith or in fraud of the rights of the city in making the contract, it was valid, and the defendant was at fault in refusing to accept the balance of the coal.

If the mayor, by establishing regulations, might have limited the discretion of the manager in the purchase of supplies to such as were necessary during his term of office, he did not do so, and, the contract having been made, the city cannot complain.

The plaintiff tried its case in the court below on the theory that the applicable rule of damages was the difference between what it cost to produce the coal at the mines and its selling or market price there, and, having introduced evidence with that theory of the law in mind, it requested the court to rule:

"That upon all the evidence the measure of damages [was] the difference between the cost of production and the selling price at the mines."

This request was refused, and its refusal is assigned as error. The court then stated that the rule of damages, if substantial damages were recoverable, was "the difference between the contract price and what the plaintiff could have sold the coal for to other persons" (meaning no doubt what it could have sold the coal for in the market at the time and place of delivery, Tufts v. Burnett, infra), but remarked that the evidence failed to show that the plaintiff had sustained any loss, saying:

"For aught that appears, the plaintiff may have resold to other persons all the coal contracted for and not taken by defendant at a price equal to that specified in the contract. If so, it suffered no loss."

The court then found and ruled as follows:

"On all the facts, I find and rule that the plaintiff, if entitled to recover, is entitled to recover only nominal damages."

This ruling is also assigned as error.

The plaintiff in presenting its case here has shifted its position from that taken in the court below. It no longer contends that the rule of damages is the difference between the cost of production and the selling or market price at the mines, as contended in the court below, but that it is the difference between the contract price and the cost of production and delivery of the coal at Taunton, for the reason that the evidence discloses that the coal contracted for was of a special kind, controlled solely by the plaintiff. Roehm v. Horst, 178 U. S. 1, 21, 20 Sup. Ct. 780, 44 L. Ed. 953; Hinckley v. Pittsburg Steel Co., 121 U. S. 264, 275, 276, 7 Sup. Ct. 875, 30 L. Ed. 967; United States v. Purcell Envelope Co., 249 U. S. 313, 320, 39 Sup. Ct. 300, 63 L. Ed. 620.

In Roehm v. Horst the plaintiffs contracted to sell and deliver to the defendant in New York "prime Pacific Coast hops" in installments.

They purchased and shipped to the defendant the first installment, but the defendant refused to receive it. The plaintiffs had not purchased the balance of the hops required to fulfill the contract at the time of the defendant's refusal, but they could have made subcontracts at prices stated for subsequent shipments. Instead of purchasing or subcontracting for the balance of the hops, they immediately brought suit for breach of the contract. It was held that the damages the plaintiffs were entitled to recover were the difference between the contract price and the cost at the place of delivery. It was there said:

"If a vendor is to manufacture goods, and during the process of manufacture the contract is repudiated, he is not bound to complete the manufacture, and estimate his damages by the difference between the market price and the contract price, but the measure of damage is the difference between the contract price and the cost of performance. Hinckley v. Pittsburg Company, 121 U. S. 264. Even if in such cases the manufacturer actually obtains his profits before the time fixed for performance, and recovers on a basis of cost which might have been increased or diminished by subsequent events, the party who broke the contract before the time for complete performance cannot complain, for he took the risk involved in such anticipation. If the vendor has to buy, instead of to manufacture, the same principle prevails, and he may show what was the value of the contract by showing for what price he could have made subcontracts, just as the cost of manufacture in the case of a manufacturer may be shown. Although he may receive his money earlier in this way, and may gain, or lose, by the estimation of his damage in advance of the time for performance, still, as we have seen, he has the right to accept the situation tendered him, and the other party cannot complain."

In United States v. Purcell Envelope Co., supra, the plaintiff agreed to furnish the Post Office Department with "stamped envelopes and newspaper wrappers in such quantities as may be called for by the department during a period of four years." The government having refused to carry out the contract, the Envelope Company brought suit. The evidence showed what the total cost to the Envelope Company would have been to produce the envelopes and wrappers and deliver them to the department, and judgment was entered for the difference between that sum and the contract price. On appeal the Supreme Court affirmed the judgment, following the decision in Roehm v. Horst, supra.

In support of the ruling in the District Court the defendant relies upon the case of Tufts v. Bennett, 163 Mass. 398, 40 N. E. 172. In that case the plaintiff contracted to sell and deliver certain goods then on hand; to manufacture, sell, and deliver certain other goods; to sell and deliver additional goods that he was to purchase elsewhere; and to perform labor and furnish stock for renovating certain apparatus belonging to the defendant. The plaintiff had the goods ready for delivery at the time agreed upon, but the defendant refused to carry out the contract. Under these circumstances the court held that the measure of damages was "the difference between the market value of the goods at the time and place of delivery and the contract price"; but, as there was no evidence from which it could be found what that difference was, only nominal damages were allowed. In that case it will be noted that at the time the defendant broke the contract the plaintiff had the goods on hand ready for delivery, and that the only

damage which he could have sustained was the difference between the market value of the goods at the place of delivery and the contract price. If at the time the defendant broke the contract the plaintiff had not had on hand the goods called for by the contract, but was able to procure or manufacture them, his damages would have been the difference between the cost of purchasing or producing the goods and the contract price; and it would not have been open to the defendant, who had broken the contract, to complain because he had not gone to the trouble of purchasing or manufacturing the goods.

[2] It does not appear in this case that the plaintiff had on hand Rockhill coal ready for delivery at the times when it would have been required to make deliveries, had the defendant not broken its contract, or, if it had it on hand, that the difference between the market price of such coal (at the time and place of delivery) and the contract price would have been less than the difference between the cost of producing and delivering it and the contract price. If it was less, and the defendant desired to avail itself of the lesser sum, the burden was upon it to show the fact.

"The burden of proving that the damages which have been sustained in such cases could have been prevented, unquestionably rests upon the party guilty of the breach of contract." Hamilton v. McPherson, 28 N. Y. 72, 84 Am. Dec. 330; Sedgwick on Damages (9th Ed.) § 227.

[3-5] Such being the case, we regard the rule stated in the above decisions of the Supreme Court as applicable and that the plaintiff is entitled to recover the difference between the contract price and the cost of production and delivery of the coal at Taunton, provided there is evidence from which this difference can be found; otherwise, only nominal damages can be allowed. Is there evidence which will justify a finding for other than nominal damages? If the figures in the table put in evidence showing the number of tons of coal purchased by the defendant during the balance of the term of the contract and the figures representing the selling price and cost at the mine relate to other kinds of coal than that which the plaintiff contracted to sell and deliver (as they appear to), it is evident that there would be no evidence from which it could be found what the damage was that the plaintiff sustained, for it could not be ascertained from it what it would have cost the plaintiff to produce the balance of the coal and deliver it at the defendant's wharf. And we encounter the same difficulty, only in a lesser degree, if we regard the figures here in evidence as stating the selling or market price and cost at the mine of Rockhill coal; for, if we assume that the evidence shows what a ton of that coal cost the plaintiff at the mine, it does not show what it would cost to deliver it at the defendant's wharf.

The mere showing of what the plaintiff's profit at the mine would have been has no tendency to prove what its damage was under the contract, for under the contract it was to deliver the coal at Taunton, and without evidence of the cost of delivery there, the damage which it suffered could not be determined. It may be said that, inasmuch as the plaintiff was entitled under the contract to receive $4.25 a ton for its

coal—if it can be assumed that the selling or market price at the mine for such coal was $1.78 a ton—the cost of transportation to Taunton would be $2.47, and that, if that were so, it could be determined what the plaintiff's damage was, for in such case the profit on the coal delivered at Taunton would be the same as the profit at the mine, without delivery. But the difficulty with this is that the difference between the cost of production and the selling or market price at the mine may not have been the same as the profit under the contract at Taunton, and whether it was the same or not could only be ascertained by evidence showing what the cost of transportation was. Such evidence is wanting. Its introduction was not necessary to sustain the rule of damages contended for in the court below, but is now, in view of the different rule here adopted; and, if we are right in our interpretation of the table put in evidence, the only judgment that can be entered is one for nominal damages.

If, however, we are mistaken as to the meaning of the figures and the statements contained in the table, and the statements and figures, when offered in evidence, were intended and understood to relate to "Rockhill coal" and not to "Berwind's standard" and "New River" coal, as stated in the table, and it was understood that the difference between the cost of production and the selling price at the mine was the same, and should be treated as the profit which the plaintiff would have made under the contract had it delivered the coal at Taunton, then the plaintiff would be entitled to recover the sum of $5,641.43, with interest from the date of the writ. In view of this situation, it is ordered:

The judgment of the District Court is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs in this court to the plaintiff in error.

ANDERSON, Circuit Judge. I am unable to concur with my Brethren's interpretation of the "table of profits" due the plaintiff on coal purchased by the defendant from other parties during the term of the contract. This table, construed in the light of the record and of the opinion of the court below, seems to me to show plainly that the stated difference between the "selling price at mines" (uniformly $1.78) and "cost at mines" (slightly varying around $1.20) was understood by the court below and by both counsel as meaning the difference between the gross cost of production plus transportation and the contract price at Taunton ($4.25), thus necessarily implying that the transportation cost was at the uniform price of $2.47 per ton—an implication entirely consistent with the known general course of business and with the fact that rail and water coal rates have for years been, in effect, made under orders of the Interstate Commerce Commission.

Nor can I concur in the statement that such implied evidence of transportation cost "was not necessary to sustain the rule of damages contended for in the court below, but is now, in view of the different rule here adopted." The rule now adopted is, in my view, the rule

consistently contended for by plaintiff's counsel from beginning to end. I discover no shifting in his position.

But as under the mandate the case may, if necessary, stand in the District Court for further hearing on damages, I concur in the result.