REFRIGERADORA DEL NOROESTE,
S. A., a Mexican corporation,
Plaintiff,

v.

Henry APPELBAUM, doing business as
Penguin Frozen Foods,
Defendant.

No. 53 C 2482.

United States District Court
N. D. Illinois, E. D.

Feb. 10, 1956.

Louis A. Kohn, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for plaintiff.

Joseph E. Clayton, Jr., Robert A. Sprecher, Chicago, Ill., for defendant.

CAMPBELL, District Judge.

The plaintiff, hereinafter occasionally referred to by its trade name, "Reno", is a Mexican corporation engaged in the business of purchasing, freezing and packing shrimp. Reno produces about an eighth of the total production of West Coast of Mexico shrimp. The defendant is a resident of Illinois and is engaged in the business of distributing shrimp in the United States and the Dominion of Canada. The case was tried before the Court and a jury on the plaintiff's complaint and the defendant's amended counterclaim; the jury having failed to return a verdict, all motions were ordered briefed and the case was taken under advisement.

On October 19, 1950, plaintiff and defendant entered into a written contract (P.'s Ex. 1) whereby plaintiff was to deliver to the defendant, for sale by the defendant, at least 90% of the plaintiff's total production of shrimp caught or purchased, packed and frozen by the plaintiff from the date of the execution of the contract up to August 15, 1951. The defendant agreed to distribute no Mexican shrimp other than the plaintiff's shrimp. By terms of the above contract, the defendant was to establish a letter of credit simultaneously with notification by the plaintiff that it was prepared to ship a carload of shrimp. Each letter of credit was to cover 75% of the market value of the carload of shrimp thus delivered. The defendant was to remit to the plaintiff 93% of the price at which the shrimp was sold by the defendant, after deducting therefrom all expenses paid or incurred by the defendant in connection with the transportation of shrimp from the plaintiff to the defendant. Under clause 11 (b) of the contract, the defendant was to deliver to the plaintiff, on or before the fifteenth day of each month, a report in writing stating 1) the names and addresses of the defendant's customers, 2) the dates on which sales were made, 3) the sale price at which the shrimp were sold, and 4) other information regarding the identification of the shrimp thus sold by the defendant. Simultaneously with the delivery of each such report, the defendant agreed to pay to the plaintiff the balance due from the defendant on all sales made by the defendant "as disclosed by such report". Under clause 18, the contract would expire on August 15, 1951 and on August 15th of each succeeding year thereafter if the contract was renewed. Under this clause, the contract was to be automatically renewed for another year unless either party notified the other to the contrary by March 1st of each year.

The parties continued under amicable business relations until July 22, 1952 when they executed a so-called extension agreement. (P.'s Ex. 3) This agreement modified the prior contract to the extent that the October 19, 1950 contract (P.'s Ex. 1) was extended for a term of two years and the plaintiff was given its option whether the defendant was to furnish letters of credit or not. If the defendant furnished letters of credit, the defendant would continue to remit 93% of the price at which the defendant sold the shrimp; otherwise, the defendant was to remit 95%. The agreement provided that with these exceptions, the terms of the prior contract would continue in effect.

After this agreement was executed, the parties again continued on amicable terms until February 25, 1953. On this date, plaintiff sent the defendant a telegram (P.'s Ex. 4) wherein the plaintiff stated that it was the plaintiff's will to terminate the October 1950 contract. (P.'s Ex. 1) This telegram continued by stating, in substance, that the Oc-

tober 19, 1950 contract (P.'s Ex. 1), by its terms, will thus end on August 15, 1953.

The defendant was quick to reply to this telegram, stating that the "July 22, 1952 contract is not subject to cancellation until 1954". (P.'s Ex. 5)

After this telegram followed a series of exchanges of telegrams and letters, the plaintiff insisting that the contract was cancelled, the defendant insisting that the contract remained in full force and effect until August 15, 1954. Notwithstanding the notice of termination for the 1953–1954 season, the plaintiff continued to fulfill its obligations for the 1952–1953 season. Beginning in October 1952 and ending in June 1953, cars 31 through 38 were shipped to the defendant. The defendant has not, as yet, paid the plaintiff for these shipments, and it is for payment of these shrimp that the plaintiff brings the instant action.

Immediately after notice of its termination, the plaintiff, through its general manager, Pedro L. Pinson, began negotiations for the formation of a new method of distribution of its shrimp. The plaintiff was instrumental in forming a new Mexican organization called Exportadores Associados. Exportadores Associados (hereinafter referred to as E. A.) consisted of five West Coast of Mexico shrimp producers whose combined production amounted to approximately one fourth of the total production of West Coast of Mexico shrimp. These producers, including the plaintiff, were stockholders in E. A. E. A., in turn, caused an American corporation to be formed, Crest Importing Company, of San Diego, California. Crest was thus formed in June 1953 and was owned entirely by E. A. On October 3, 1953, a contract was executed between E. A. and Crest whereby E. A. was to sell, and Crest was to purchase, all of E. A.'s production of shrimp. The producers who comprised the stockholders of E. A., with the exception of the plaintiff, had previously agreed to sell their entire production to E. A. which, of course, was then obligated to sell to Crest. There is no competent evidence in the record which reflects that the plaintiff, at any time before the instant controversy, entered into any contract, or became otherwise bound, to sell its production to either E. A. or Crest. Likewise, there is no competent evidence that the plaintiff was a party to the contract which had been executed between Crest and E. A.

During the exchange of telegrams and letters between the parties concerning whether the contract was terminated or not, the defendant's son, Mr. Robert Appelbaum, and then the defendant himself went down to Mexico in an attempt to persuade the plaintiff into continuing to perform its contract with the defendant. Nothing of legal consequence occurred during these visits as the plaintiff continued to insist that the contract was legally terminated and the defendant continued to hold that it was not. In the meantime, the plaintiff had begun to attempt to persuade the defendant into taking a sub-brokerage through Crest.

The relationship between the parties remained in this status until August 28, 1953. At this time, the defendant sent the plaintiff a telegram (P.'s Ex. 11) stating that he did not intend to continue a pointless exchange of telegrams and demanding that the plaintiff send an authorized representative to Chicago in order that an amicable solution might be reached.

On September 24, 1953, two conferences were held at Chicago, Illinois. Present at these meetings were the defendant, Henry Appelbaum, his son Robert, the defendant's attorney, Stanford Clinton, John Willis, president of Crest, Oscar Fraustro, chairman of Reno's board of directors and general comptroller of Nacional Financiera, and Monroe Collenburg, attorney representing Reno and Nacional Financiera. Nacional Financiera is an agency of the Mexican government and owns 75% of the plaintiff's capital stock. The function and purpose of Nacional Financiera is

quite similar to that of the R. F. C. in the United States.

At these conferences, the defendant was offered three alternative settlements under which his contract with Reno might thus be amicably terminated. These offers were rejected by the defendant who made counter-offers which were likewise rejected by Reno. Mr. Collenburg testified that at the end of the second conference he asked the defendant whether it was his, the defendant's, position that the contract with Reno had another year to go and, if so, whether he, the defendant, was ready to perform. Collenburg testified that he then asked the defendant whether this was true and whether it was the defendant's position that the plaintiff should perform the contract for the remaining year. Collenburg testified that the defendant replied, "Yes. That is it, exactly".

The relationship between the parties remained in this position until October 3, 1953. On this date, the plaintiff sent the defendant a telegram and confirmation letter (P.'s Ex. 12) which stated that the plaintiff's board of directors had confirmed the extension letter agreement (P.'s Ex. 3) of July 22, 1952 and that, therefore, the contract between the parties remained in full force and effect. The telegram also demanded payment on or before October 7, 1953 of all sums due the plaintiff as a result of previous shipments of shrimp to the defendant during the preceding year. The telegram further informed the defendant that the plaintiff anticipated shipping the first car of shrimp around October 9th and instructed the defendant to open a letter of credit to cover it. The confirmation letter further asserted that the plaintiff was awaiting payment as requested and informed the defendant that the plaintiff had suffered grave damage as a result of defendant's failing to make payment. The confirmation letter concluded by stating that any further delay in making payment as requested might result in the plaintiff's financial failure.

To this communication, the defendant replied with a telegram dated October 6, 1953. (P.'s Ex. 13.) This telegram stated that the defendant was gratified to have the plaintiff acknowledge its responsibility under the contract and indicate its intention to perform. The defendant further stated that in light of his recent experiences with the plaintiff he was entitled to adequate security for the plaintiff's performance. The telegram further stated that the defendant was puzzled at plaintiff's direction to open only one letter of credit when the plaintiff had previously requested five or more at the opening of the season.

The plaintiff replied to the defendant's telegram of October 6th (P.'s Ex. 13) with its telegram of October 7, 1953, (P.'s Ex. 14). This telegram stated that the parties' commercial relations were renewed under the original contract and extension, noting that the defendant's October 6th telegram omitted confirmation that the defendant had made the required payment as per the plaintiff's previous telegram. The telegram concluded with the warning that plaintiff categorically demanded payment by the defendant.

The defendant answered this telegram with another telegram dated October 8, 1953. (P.'s Ex. 15.) In this telegram, the defendant stated that he would continue to remit for cars as they were "completely sold out in accordance with past practice so long as" the plaintiff lived up to its agreement.

On October 20, 1953, the plaintiff sent the defendant its telegram (P.'s Ex. 16) replying to the defendant's telegram of October 8th. (P.'s Ex. 15.) In this telegram, the plaintiff stated that it considered defendant's failure to make payment as requested in plaintiff's telegram of October 3rd (P.'s Ex. 12), a most serious breach of contract. The telegram went on to state that because of defendant's breach, the plaintiff refused to send the defendant any more shrimp. The defendant was then directed to make payment as directed to the First National Bank of Chicago and

deposit also with the bank all warehouse receipts covering plaintiff's shrimp that the defendant had not, as yet, sold.

This line of correspondence between the parties ended with defendant's telegram of October 21, 1953 (D.'s Ex. 3.) In this telegram, the defendant stated that he was not at all surprised with the notice contained in plaintiff's telegram of October 20th. (P.'s Ex. 16.) The defendant stated that he placed no reliance on plaintiff's promises since, in the defendant's opinion, the plaintiff's conduct since February 25, 1953 proved that it, the plaintiff, desired to evade its obligations under the contract.

Following this last correspondence, all negotiations between the parties broke down. The plaintiff has filed this suit seeking payment by the defendant for cars 31 through 38 which were shipped to the defendant during the 1952–1953 season. Defendant has filed his amended counterclaim, alleging that the plaintiff violated the contract with the result that the defendant suffered damages well in excess of the amount of plaintiff's claim.

It should, at the outset, be observed, that defendant's failure to make payment as directed, in the absence of a justifying cause, amounted to a breach of contract excusing the plaintiff from its duty of immediate performance. Payment for the cars shipped during the previous season in the absence of legal justification, was a condition precedent to the plaintiff's duty to perform for the following season. However, the defendant cites, in substance, two grounds in support of his position that he was legally justified in not making payment to the plaintiff as directed. First, he contends that the plaintiff's anticipatory breach of February 25, 1953 (P.'s Ex. 4) ripened into an actual breach on August 15, 1953. Secondly, defendant argues that there was no immediate duty on his part to make payment to the plaintiff when this payment was requested. Each ground on which the defendant relies is particularized herein as each is considered. If it is

determined that the defendant, and not the plaintiff, breached the instant contract, then it will be unnecessary for the Court to consider the merits of the amended counterclaim, since if it is held that the defenses asserted are not tenable, then the amended counterclaim must of necessity fail also because the amended counterclaim relies on legal contentions asserted in defense to and recoupment against the plaintiff's complaint.

### First Defense

It is, of course, true that plaintiff's telegram of February 25, 1953 (P.'s Ex. 4) amounted to an anticipatory breach of contract. This anticipatory breach could have been effectively withdrawn at any time prior to the due date of the repudiator's performance if, in the interim, the injured party has not brought an action on the anticipatory breach or has not otherwise materially changed his position. Alvey-Ferguson Co. v. Ernst Tosetti Brewing Co., 178 Ill.App. 536; Restatement of Contracts, Sections 312, 318, and 319. The record being void of any such evidence of estoppel, the due date of the plaintiff's performance must be determined since a withdrawal of the anticipatory breach prior to that date would nullify its effect as a breach.

The defendant apparently contends that the due date for the plaintiff's performance was August 15, 1953. Defendant argues that the plaintiff's anticipatory breach was subject to withdrawal at any time prior to August 15th, at which time, in the absence of such withdrawal, the anticipatory breach ripened into an actual breach of contract. The defendant's position, in this regard, is untenable for two reasons. First of all, the evidence in this case clearly reveals that the Mexican shrimp season runs from October to July of the following year. During the course of the parties' business relationship, the plaintiff at no time shipped the defendant any shrimp prior to October. The plaintiff would begin to ship shrimp in October and the last shipment would be sent in

June or July of the following year. It is clear, therefore, that the crucial date was not August 15, 1953 as counsel for the defendant suggest. The anticipatory breach was subject to withdrawal at any time prior to the due date of the plaintiff's performance, which, in the present case, was any time during the month of October, 1953, depending on when the Mexican shrimp season actually started. Secondly, the provision in the original contract (P.'s Ex. 1) regarding contract years was expressly superseded by the terms of the extension agreement. (P.'s Ex. 3.) The original contract between the parties (P.'s Ex. 1), as contained in clause 18 of that contract, provided for a contract term of one year expiring on August 15, 1951. If renewed, the contract as renewed would end on the following August 15th. However, the extension agreement (P.'s Ex. 3) did away with the one-year term of contract and provided for a two-year term instead. The extension agreement expressly extended the contract term for a period of two years. Thus, the contract was extended for two years from August 16, 1952 to August 15, 1954. The one-year clause contemplating the contract's termination on August 15th of each year was superseded by a two-year period ending on August 15, 1954. Accordingly, the significance of the date of August 15, 1953 was lost when the extension agreement was executed. I conclude, therefore, that the date of August 15, 1953 was a date of no legal consequence.

Counsel for the defendant argue that even the plaintiff believed August 15, 1953 to be the crucial date. Counsel cite the plaintiff's notice of termination (P.'s Ex. 4) which states that the contract will end on August 15, 1953. The difficulty with this argument is that the plaintiff believed it had a legal right to terminate the contract on August 15, 1953. The evidence however, shows that the plaintiff was in error and was finally persuaded that the contract could not be legally terminated until August 15, 1954. The defendant cannot lift himself by what obviously was an erroneous assumption on the plaintiff's part.

Having thus determined that the plaintiff's anticipatory breach (P.'s Ex. 4) could be effectively withdrawn before plaintiff's duty of immediate performance arose (said performance being due sometime in October 1953), I hold, as a matter of law, that plaintiff's notice of October 3, 1953 (P.'s Ex. 12) was an effective withdrawal of plaintiff's anticipatory breach of February 25, 1953. (P.'s Ex. 4.) The contract having been restored to full effect and vitality, it was then incumbent upon the defendant to perform his part of the contract.

Notwithstanding the notice of intent to perform (P.'s Ex. 12), counsel for the defendant argue that the plaintiff's acts were such that it was impossible or apparently impossible for the plaintiff to perform its contract with the defendant. Counsel argue that Reno was legally obligated to sell its shrimp to E. A. or Crest for the 1953–1954 season and that the plaintiff, therefore, could not fulfill its obligations to the defendant. The short answer to this contention is that the record is completely void of any competent evidence proving, or tending to prove, that Reno became bound, by written contract or otherwise, to sell its production to either E. A. or Crest. The evidence merely shows that the plaintiff's plans for E. A. and Crest were of the long range variety, contemplating this system of distribution after the contract with the defendant had terminated. The defendant's argument, therefore, is totally without merit.

### Second Defense

The defendant next contends that he was under no duty to pay the plaintiff on October 3, 1953 because, the defendant argues, payment for each car of shrimp was due only after that car had been completely sold out and on October 3, 1953, the cars being presently sued for by the plaintiff had not, as yet, been completely sold out. In this

regard, counsel for the defendant rely on the defendant's testimony to the effect that it was his practice to pay for each car as it was completely sold out. However, I find defendant's testimony to be of no value in view of his statements in a letter to the plaintiff dated August 6, 1953. (P.'s Ex. 21.) In this letter, the defendant, in speaking of the July 22, 1952 extension agreement (P.'s Ex. 4), stated:

"* * * While the understanding was that we would pay the bank when we were paid, there was not one car out of 30 that was not paid long before we received our money for it and long before the due date. Moreover, if you will check your records, I sincerely doubt if you will find more than a few cases where we failed to pay the bank for any car before it was completely sold out."

Such statements, contained in a letter so contemporary with the parties' disagreement, compel this Court to find, as a matter of law, that the defendant's testimony in this regard is entitled to no weight whatsoever This is particularly so because counsel have failed to explain the obvious inconsistency between the defendant's testimony and his prior written statements.

 Counsel also rely on testimony elicited, on cross-examination, from Pedro L. Pinson in order to prove the suggested practice of payment. However, this proof is faulty for two reasons. First of all, a review of the record clearly reveals that the witness Pinson was entirely confused when asked questions concerning the practice of payment. He stated that he did not know what the word "practice" meant. When asked whether the practice from the date of the extension agreement was to pay for cars as they were completely sold out, Pinson testified that he didn't remember. (Tr. 181.) Counsel for the defendant then rephrased the same question, employing terminology that at best was not too clear. To this question,

which also contained a condition for instances where advances were made to the plaintiff, Pinson answered "yes". Thus, when viewed from this position, I believe the admission elicited from Pinson is entitled to little, if any, consideration. Pinson's testimony, taken as a whole, clearly indicates that he meant that it was defendant's practice to pay for each car "as it was sold" as distinguished from "as it was completely sold out". Secondly, if it was counsel for the defendant's intention to prove a practice of making payment then it was incumbent on the defendant to prove this by direct testimony in his case in chief and not by admissions on cross-examination during the plaintiff's case. Evidence elicited on cross-examination is not substantive evidence and cannot be used to prove an issue which must be proved with direct testimony by the party asserting it.

Clause 11(b) of the original contract (P.'s Ex. 1) provided that the defendant should submit a monthly report to the plaintiff. This clause also provided that simultaneously with this report, the defendant was to pay the plaintiff for the balance due on all sales as declared by such report. The extension agreement (P.'s Ex. 3) merely allowed for the contingency that the defendant, at the plaintiff's option, need not open letters of credit, in which case the amount remitted to the plaintiff would be 95% rather than 93% of the defendant's sale price. The extension agreement expressly stated that all other provisions of the original contract (P.'s Ex. 1) would remain in full force and effect. Clearly, therefore, by the unambiguous terms of the written contract, the defendant was obligated to pay the plaintiff for all shrimp which the monthly report had revealed were sold during the preceding month. The defendant, having failed to do this for many months, the plaintiff was entitled to refuse to further perform its part of the contract.

 However, even assuming, for purposes of argument, that the practice was to pay the plaintiff as the cars were

completely sold out, the plaintiff, on adequate notice, had the right to insist that all payments were to be according to the strict terms of the contract. Thus, the plaintiff notified the defendant, in its telegrams of October 3, 1953 (P.'s Ex. 12) and October 7, 1953 (P.'s Ex. 14) that payment for the shrimp that had been sold was an absolute necessity. The defendant was thus warned that payment was of the essence. Knowing that the plaintiff had previously desired to terminate the contract, and knowing that the plaintiff was then persuaded, by competent American counsel, to fulfill its contractual obligations and had retracted its repudiation, it was incumbent on the defendant to punctiliously perform the contract on his part by making payment so as to give the plaintiff no cause to legally terminate the contract.

Thus, in Roehm v. Horst, 178 U.S. 1, at page 11, 20 S.Ct. 780, at page 784, 44 L.Ed. 953, the Supreme Court said:

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party, not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it."

In the present case, the evidence is clear and convincing that the defendant refused to pay not because of any vague practice of paying but because he wanted adequate security that the plaintiff would continue to perform its contract. The defendant, clearly, withheld funds in order to hold this club over the plaintiff's head in case it refused to perform.

Adopting such a plan, the defendant embarked on a rather hazardous course for the protection of his rights. Having withheld funds legally owed the plaintiff, the payment of which being a condition precedent to the plaintiff's duty of immediate performance, the defendant thus breached his contract with the plaintiff entitling the plaintiff to legally terminate the contract.

■ Counsel for the defendant argue that the defendant was legally justified in desiring security for the plaintiff's continued performance. Counsel assert, and have offered some evidence of oral admissions by third parties, that in Mexico a contract "does not mean anything". It is argued that if the plaintiff breached the contract, the defendant would be left with a bare right that could not be asserted in a court of competent stature. However, this Court cannot assume that the Republic of Mexico is not a civilized nation where foreigners cannot secure redress of their grievances as well as can persons native to that country. I must assume, in the absence of competent evidence to the contrary, that a written contract in Mexico enjoys all the sanctity and attendant rights as it does in this country. If the defendant contends otherwise, then he must prove his position by competent evidence and not by testimony of what third parties have asserted concerning the dignity of a contract in Mexico. Furthermore, when the defendant entered into this contract with the plaintiff, he assumed the risk that, if the plaintiff breached the contract, he could not assert his right to be compensated for the wrong thus done him.

■ I hold, therefore, as a matter of law, that the defendant's refusal to make payment to the plaintiff as directed was a breach of contract, entitling the plaintiff to legally terminate the contract and bring the present action. Having made such a determination, I hold that the defendant's amended counterclaim is totally without merit, since the defendant, and not the plaintiff, breach-

ed the contract in issue. Hess Co. v. Dawson, 149 Ill. 138, 36 N.E. 557; Chicago Washed Coal v. Whitsett, 278 Ill. 623, 116 N.E. 115. The issues involved being manifestly issues of law, the plaintiff's motion for a directed verdict, on the complaint and amended counterclaim, should be granted.

It must now be determined the amount of damages to be awarded. The evidence reveals that the defendant is indebted to the plaintiff for eight carloads of shrimp, numbered 31 through 38, inclusive, which were shipped to the defendant during the period from October, 1952 through June, 1953. According to a document (P.'s Ex. 17) submitted by Mr. Sprecher, defendant's counsel, to Mr. Kohn, plaintiff's counsel, the amount due the plaintiff for cars 31 through 38 was stated by Mr. Sprecher to be $198,153.81. Mr. Olson, a certified public accountant, testified that after reviewing the defendant's books and records, he discovered a mathematical error, in the defendant's favor, of $1,000 in the Sprecher memorandum. (P.'s Ex. 17; Tr. 46.) Adding this $1,000 to the sum reflected by the Sprecher memorandum, the amount due the plaintiff was raised to $199,153.81. Olson then testified that an additional commission of $315.72 was due the defendant on sales from cars 29 and 30 and that this amount, when subtracted from the sum of $199,153.81, left the total principal amount due the plaintiff at $198,838.09. (Tr. 46.)

There are, however, several items that had been deducted by the defendant, and thus charged to the plaintiff, which the evidence clearly reveals are improper deductions to which the defendant, therefore is not entitled. In the Sprecher memorandum (P.'s Ex. 17), the defendant claimed a deduction of $4,816.56 for certain breading items which the defendant alleged were chargeable to the plaintiff under an alleged oral contract for breading shrimp, said contract having been set up in the defendant's amended counterclaim. The Court, however, ruled that the action on the oral contract was barred by the Statute of Frauds; therefore, any breading deductions are improper. Thus, the sum of $4,816.56 must be held to be an improper deduction. (Tr. 49–51.) The evidence also reveals that the plaintiff is entitled to an additional $1,136.78, which represents an amount charged the plaintiff for storage and handling in excess of the amount actually paid by the defendant during the period from February 28, 1953 to February 28, 1954. (P.'s Ex. 18; Tr. 51.) The plaintiff is also entitled to the sum of $2,992.96, said sum representing rebates on storage charges for the two years ending October 31, 1952. (P.'s Ex. 18; Tr. 52.) Robert Appelbaum, who is in charge of the defendant's books and records, testified that the sums of $1,136.78 and $2,992.96 were funds either refunded to, or not actually paid by, the defendant. (Tr. 581, 582.) These sums were clearly improper deductions because clause 11(b) II of the original contract (P.'s Ex. 1) provided that only deductions for items actually spent could be chargeable against the proceeds of sales. I hold, therefore, that these three deductions, amounting to $8,946.30, were clearly improper deductions to which the defendant is not entitled.

 There are, however, in addition to these deductions which were clearly improper, two items for which Olson, the plaintiff's expert witness, could find no supporting evidence in his examination of the defendant's books and records. (Tr. 53, 54.) These items are 1) an adjustment for $1,350 on truck insurance charged the plaintiff and 2) an adjustment for $1,743.90 on storage and handling. As to the $1,350 truck insurance item, the defendant's letters of August 6, 1953 and May 25, 1953 (P.'s Ex. 21 and 28 respectively) both contain admissions by the defendant that an adjustment on this item in the plaintiff's favor would be proper. Concerning the $1,743.90 storing and handling adjustment, Olson testified that he found no supporting evidence indicating whether this amount should, or

should not, have been credited to the plaintiff. The defendant offered no evidence which would prove, or tend to prove, that these sums were properly deductible. The plaintiff having questioned these deductions, it was then incumbent on the defendant, having control of all the books and records, to prove the propriety of such deductions in diminution of the plaintiff's demand. 1 C.J.S., Accounting, § 39(b). The defendant, having failed to sustain this burden, the offset must be disallowed and the plaintiff's claim must accordingly be increased by $3,093.90, the sum of said unexplained deductions.

In conclusion, the sum total of the principal, clearly improper deductions, and unexplained deductions amounts to $210,878.29. This sum represents the total amount due and owing the plaintiff, without interest.

In accordance with the views expressed, I therefore hold as a matter of law that the defendant, and not the plaintiff, breached the instant contract. Accordingly, the plaintiff is entitled to a judgment in its favor for $210,878.29, plus interest.

The plaintiff's motion for a directed verdict on the complaint, which was taken under advisement pursuant to Rule 50(b), 28 U.S.C.A. at the conclusion of all the evidence, is hereby granted. The plaintiff's motion for a directed verdict on the amended counterclaim, which was similarly taken under advisement pursuant to Rule 50(b), is hereby also granted. Defendant's motions for a directed verdict on the plaintiff's complaint and on the defendant's amended counterclaim are hereby denied.

Insofar as they may be required, the facts described and the conclusions expressed herein shall stand as findings of fact and conclusions of law, as provided in Federal Rule 52(a).

Judgment is hereby entered for the plaintiff in the sum of $210,878.29 plus interest at 5% to June 15, 1955 the date the case was submitted to the jury, plus the costs of this litigation.